**SUBURBAN PROPANE, A DIVISION OF NATIONAL DISTILLERS AND CHEMICAL CORP., Plaintiff–Appellee,**

v.

**PROCTOR GAS, INC., and James Taranovich, Defendants–Appellants.**

**No. 1894, Docket 91–7240.**

United States Court of Appeals, Second Circuit.

Argued Aug. 14, 1991.

Decided Jan. 9, 1992.

Gary H. Barnes and Robert A. Miller, Burlington, Vt, for defendant-appellant.

William B. Miller, Jr., John F. Evers and John L. Kellner, Middlebury, Vt., for plaintiff-appellee.

Before MINER, WALKER and McLAUGHLIN, Circuit Judges.

WALKER, Circuit Judge:

After a contractual business relationship between a gas supplier, Suburban Propane (Suburban) and a gas retailer, Proctor Gas, Inc. (Proctor) came apart, Suburban sued in the United States District Court for the District of Vermont (Lee P. Gagliardi, *Judge*), for breach of contract and interference with its business relations. Proctor counterclaimed, asserting antitrust violations, breach of contract and interference with its business relations.

On appeal following a jury trial, we agree with Proctor that the district court's damage award in favor of Suburban on its contract claim cannot be sustained. In all other respects, we affirm the district court's judgments dismissing and denying all other claims and counterclaims.

## BACKGROUND

Suburban is a national wholesale and retail distributor of propane gas for residential, commercial and industrial use. Suburban has an office in Rutland, Vermont, and distributes propane gas, also referred to as LP–Gas, directly to its Vermont customers "in bulk," by filling tanks installed at the customer's premises from Suburban's "bobtail" trucks. Starting in 1966, Suburban's Rutland office also distributed LP–Gas through Proctor. Proctor started distributing Suburban's LP–Gas in 1966 by the cylinder exchange method. Proctor would pick up 100–pound cylinders filled with LP–Gas from Suburban's Rutland facility, deliver them to retail customers, and retrieve empty cylinders for refilling at Suburban's Rutland facility.

In the late 1970s due to price competition from bulk dealers, Proctor's cylinder business started to decline. In 1983, Proctor sought to become one of Suburban's "investment dealers" whereby Proctor would also operate a bobtail truck and serve customers who had bulk gas tanks and other equipment on their premises. Suburban agreed and on October 11, 1983 Proctor's president, James Taranovich, executed two agreements on Proctor's behalf.

The first contract relating to bulk gas distribution, the "Investment Dealer Agreement" (IDA), required Proctor to: (1) notify all its customers that they were, in fact, Suburban's customers; (2) purchase LP–Gas exclusively from Suburban and to install and service "customer equipment," defined in the IDA as "all cylinders, tanks, regulators, meters fittings and related equipment which are or are intended to be installed on Customer premises and which are owned by Suburban;" and (3) purchase Suburban LP–Gas "in accordance with Suburban's applicable schedule of LP–Gas rates in effect at time of sale."

The second contract signed by Taranovich was the "Dealer Agreement 100 LB Cylinder" ("Exchange Cylinder Agreement"). It permitted Proctor to continue operating its exchange cylinder business and provided that Proctor "shall not distribute or sell any LP–Gas or LP–Gas equipment or cylinders not acquired from or approved by Suburban or permit any LP–Gas not acquired from Suburban to be used with or in Suburban's equipment or cylinders."

After Suburban agreed that Proctor could distribute bulk gas, Proctor purchased a bobtail truck. As Suburban made the larger tanks available, Proctor began to convert customers from exchange cylinders to bulk tanks. In early 1987, however, Proctor began to acquire bulk tanks from another supplier for reasons that were in dispute at trial. Taranovich maintained that he was dissatisfied with the quality of the tanks supplied by Suburban and the slow pace at which Suburban made them

available. Suburban contended Taranovich said only that he felt he needed more equity in his business than the bobtail truck he had purchased.

Subsequently, Suburban officials offered Proctor a choice: either sell the new non-Suburban tanks to Suburban and lease them back, or return them to their original vendors. Taranovich refused to do either.

Shortly after the meeting, Suburban's general counsel sent Taranovich a letter, dated May 18, 1987, stating that the purchase of "a significant quantity of LP–Gas equipment" was in default of the Exchange Cylinder Agreement. The letter threatened termination of the Exchange Cylinder Agreement within five days if Proctor failed to cure the default.

On June 19, 1987, Suburban refused to service Proctor's bobtail truck at Suburban's bulk LP–Gas facility. Later that day, Proctor received a letter from Suburban, dated June 17, 1987, terminating the Exchange Cylinder Agreement. The letter demanded receipt of all Proctor's customer agreements and records, and an accounting of all equipment, cylinders and LP–Gas obtained by Proctor under the Exchange Cylinder Agreement. There was no reference in the letter to the IDA.

Both Proctor and Suburban then scrambled for the customers Proctor had served as a Suburban dealer. Suburban ran local newspaper advertisements suggesting that customers served by Proctor should call Suburban directly for uninterrupted gas service. Meanwhile, Proctor told the customers that it would continue to serve them although it would no longer be a Suburban dealer. Proctor retained more than 90 percent of its customers.

In July, 1987, Suburban filed a state court complaint against Proctor and Taranovich claiming amounts due on account and damages for breach of contract as well as seeking injunctive relief to enforce non-competition covenants contained in the agreements. Later Suburban voluntarily dismissed its claim for injunctive relief as well as all claims brought against Taranovich individually.

Proctor timely removed the action to federal court based on the parties' diversity of citizenship and then filed an answer and counterclaims. The counterclaims, subsequently amended, alleged breach of contract, tortious interference with business relations, fraud, defamation, and violations of the federal antitrust laws.

Before trial, Chief Judge Franklin Billings granted Suburban's motion for summary judgment dismissing Proctor's antitrust claims. Subsequently, the case was tried to a jury by Judge Gagliardi.

The jury found that: (1) Proctor breached the IDA's exclusive-equipment provision; (2) as a result of this breach, Suburban suffered damages in the amount of $105,378; (3) Suburban did not breach the IDA; and (4) neither Proctor nor Suburban intentionally interfered with the other's customer business relations. After trial, Proctor moved for judgment notwithstanding the verdict. The district court denied the motion and entered judgment in favor of Suburban.

This appeal followed.

## DISCUSSION

On appeal, Proctor argues the following: (1) Proctor did not breach the IDA because the agreement did not prohibit Proctor from using tanks acquired from sources other than Suburban; (2) Suburban failed to prove that it suffered any damage as a result of Proctor's supposed breach; (3) the district court erred when it excluded evidence on Proctor's breach of contract counterclaim; (4) the district court erroneously kept from the jury Proctor's claims for fraud and tortious breach of contract; (5) the district court erred by excluding Proctor's claim for punitive damages; and (6) the district court erroneously granted summary judgment to Suburban on Proctor's antitrust claims.

We agree that Suburban failed to establish damages for breach of contract, and therefore we vacate the damage award. However, in all other respects, we affirm the district court.

I. *Suburban's Breach of Contract Claim*

█ Suburban claimed and the jury found that Proctor breached the IDA by purchasing bulk tanks from other suppliers, rather than renting them from Suburban. Suburban's claim was based upon a contractual provision that (1) authorized Proctor to provide gas service to the Customers, and (2) obligated Proctor to "purchase its entire requirements of LP–Gas solely from Suburban" and to "Install and service Customer Equipment; ..." Elsewhere in the agreement, "Customer Equipment" was defined as "all cylinders, tanks, regulators, meters, fittings and related equipment which are or are intended to be installed on Customer premises and which are owned by Suburban."

At trial, Suburban argued that these provisions required Proctor to use *only* tanks that had been supplied by Suburban. While the word "only" did not appear in the text of the relevant provisions, Suburban asserted that the manifest intention of the agreement, read as a whole, supported its construction. The district court left to the jury the question of whether the IDA included this particular exclusivity agreement.

On appeal, Proctor argues that the district court erred in sending the question of Proctor's breach of the putative exclusivity provision to the jury. Proctor relies on *Cross–Abbott Co. v. Howard's, Inc.,* 124 Vt. 439, 443, 207 A.2d 134 (1965), for the proposition that all valid covenants in restraint of trade must be explicitly stated. In *Cross–Abbott* the Supreme Court of Vermont stated that "[s]uch provisions restricting the liberty of doing business must be written into a contract with clear and unambiguous language and must not be left to inference or interpretation." *Id.* at 444, 207 A.2d at 139. Proctor's point is that since the pertinent IDA provisions did not clearly require it to purchase customer equipment exclusively from Suburban, the jury was asked to infer a restriction not contained in the agreement in contravention of *Cross–Abbott.*

We think Proctor's reliance on *Cross–Abbott* is misplaced. *Cross–Abbott* in-

volved an equitable action for an injunction and not a lawsuit for damages, as is the case here. The court in *Cross–Abbott* clearly limited the effect of its holding to situations involving equitable restraints, when it stated:

> Courts of *equity* should always proceed with caution in giving effect to contracts which impose a *restraint* by restrictive provision.... Valid agreements in restraint of trade must be established by clear and satisfactory proof in order to justify a court in restraining their breach *by injunction.*

*Id.* (emphasis added). Because we believe that *Cross–Abbott* is limited to the proposition that· Vermont courts should be cautious on interpreting contracts so as to impose an equitable restraint in doing business, and because we find no authority in Vermont for extending the proposition to a situation involving a suit at law, we conclude that the district court did not err in allowing Suburban to present its claim for breach of contract to the jury.

We find support for this course in a subsequent Vermont case where a plaintiff sought money damages for violation of a restrictive covenant. In *Addison County Automotive, Inc. v. Church,* 144 Vt. 553, 481 A.2d 402 (1984), the Vermont Supreme Court stated that when the meaning of a restrictive covenant is ambiguous, "the interpretation [is] left to the jury and extrinsic evidence of the parties' actions and intentions [are] admissible *to assist the jury in determining the meaning.*" 144 Vt. at 557, 481 A.2d at 405 (emphasis added). Thus we read Vermont law as permitting the jury to resolve contractual ambiguities concerning exclusive-dealing requirements in suits for damages.

Finally, we note that even if the district court erred in leaving the resolution of the ambiguous restriction to the jury, the error would have no practical consequence in this case, since we hold that Suburban failed to prove any damages resulting from Proctor's purchase of non-Suburban tanks.

II. *Suburban's Damage Award*

Proctor argues that the·district court should have granted its motion for a judg-

ment n.o.v. setting aside the damage award of $105,378 in favor of Suburban on its breach of contract claim since there was insufficient evidence to connect any such damages to the breach. We agree.

We are mindful that "[j]udgment n.o.v. should be granted only when (1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise or conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against him." *Mallis v. Bankers Trust Co.*, 717 F.2d 683, 688–89 (2d Cir. 1983) (citations omitted). Since upon this record there was a complete absence of evidence supporting the damage award, the district court erred in denying Proctor's motion for a judgment n.o.v.

Under Vermont Law, two types of damages are recoverable for breach of contract: direct damages and consequential damages. Direct damages are "those damages for losses that naturally and usually flow from the breach itself." *A. Brown, Inc. v. Vermont Justin Corp.*, 148 Vt. 192, 196, 531 A.2d 899, 901 (1987) and must be "such as the parties must fairly be supposed to have considered." *Id.* Consequential damages are damages that "pass the tests of causation, certainty, and foreseeability, and, in addition, [can] be reasonably supposed to have been in the contemplation of both parties at the time they made the contract." *Id.* at 197, 531 A.2d at 902.

It is clear from the record that in awarding Suburban $105,378, the jury rendered an award for damages that were neither direct nor consequential. The evidence from which the $105,378 was derived, as testified by plaintiff's expert, consisted of 1988 gas revenue profits from those Suburban customers that had been serviced by Proctor and who remained with Proctor after Suburban terminated the agreements. Suburban's claim that these lost customer revenues were direct damages from Proctor's breach of contract since they "naturally and consequently

flowed from the breach" is unavailing because it muddles the distinction between direct and consequential damages.

Direct damages naturally flowing from Proctor's breach of the exclusivity clause would have been items such as Suburban's loss of bulk tank rental profits due to Proctor's purchase of tanks elsewhere. But Suburban submitted no evidence in support of such a claim or anything like it. Indeed, the only evidence in the record relating to direct damages resulting from Proctor's use of non-Suburban tanks went the other way. Suburban's regional manager, John Reilly, admitted that Proctor continued to pay the franchise charge for its use of Suburban's tanks, even for those that Proctor had replaced with non-Suburban stock. Thus Suburban failed to prove any direct damages. *See Dufresne–Henry Engineering Corp. v. Gilcris Enterprises, Inc.*, 136 Vt. 274, 277, 388 A.2d 416, 418–19 (1978).

Suburban's claim that the lost customer profits for 1988 are sustainable as consequential damages of Proctor's breach of the exclusivity clause, although a closer question, ultimately fares no better. To be sure, Proctor's breach in 1987 initiated a chain of events that ultimately resulted in Suburban's customer loss to Proctor in 1988: following Proctor's breach, Suburban terminated the agreements; Proctor then solicited Suburban's customers that it had serviced and supplied with gas; certain Suburban customers then chose Proctor over Suburban. However, Suburban's 1988 customer loss "consequences" were, at best, only remotely caused by Proctor's breach of the *exclusivity clause*. Rather, the loss "consequences" complained of by Suburban were the proximate result of Proctor's ability to win over Suburban's customers who were free to choose their supplier. Proctor's garnering of the customers only occurred after Suburban, not Proctor, acted to terminate the agreement against Proctor's wishes. Proctor's violation of the exclusivity clause need not have led to Suburban's customer flight and probably would not have done so if Suburban had not exercised its discretion to terminate the agreements over a relatively mi-

nor breach, or if Proctor had not been successful in the parties' scramble for customers. Thus, the chain connecting Proctor's breach and Suburban's customer loss is simply too attenuated to satisfy the causation element of consequential damages.

Moreover, as weak as is the causal link between the breach and asserted consequential damages, there was insufficient proof as to the element of foreseeability either at the time of contracting or at the time of the breach. The venerable holding of *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng.Rep. 145 (1854), first established the rule applicable here. In *Hadley v. Baxendale*, when the carrier of the miller's broken shaft was delayed for several days, causing the miller to lose profits, the miller could not recover the profits from the carrier because the loss was not "such as may reasonably supposed to have been in the contemplation of both parties, at the time they made the contract as the probable result of the breach of it." *Id.*, 9 Ex. 354, 156 Eng.Rep. at 151. For all the carrier knew, the miller might have had a good spare shaft or the mill might have been defective in other respects and hence unable to operate. *See* Farnsworth, Contracts (1982) § 12.14.

The rule of *Hadley v. Baxendale* lives on in Vermont law. *See e.g. Albright v. Fish*, 138 Vt. 585, 590, 422 A.2d 250, 254 (1980); *Berlin Development Corp. v. Vermont Structural Steel Corp.*, 127 Vt. 367, 370, 250 A.2d 189, 192 (1968); *Norton & Lamphere Construction Co. v. Blow & Cote, Inc.*, 123 Vt. 130, 135, 183 A.2d 230, 235 (1962). In the instant case, no evidence was produced to show that when they entered the contracts in 1983 Suburban and Proctor could reasonably have anticipated that *Proctor's breach by purchasing tanks from suppliers other than Suburban* would result in Suburban's loss of customers to Proctor. Indeed, even as of the breach, the foreseeability of such a consequence to Proctor was improbable. After all, and as noted earlier, whether Proctor's relationship with Suburban would end was within the control of Suburban, not Proctor. Moreover, as of the breach neither party could have foreseen that Suburban's

customers, who were free to choose their gas supplier, would continue with Proctor.

The traditional rationale underlying an award of consequential damages is that it compensates the aggrieved party for those losses mutually foreseen as the "probable result" of a particular breach. *See Albright*, 138 Vt. at 590, 422 A.2d at 254. Suburban's generalized concern over customer loss to Proctor, as expressed in this contract by a non-competition clause, will not support an award of consequential damages for a breach of an unrelated provision. "[S]ince [customer loss] is not the type of damages that ordinarily would be considered to result from a breach of" an equipment exclusivity clause, it was not a foreseeable consequence of Proctor's breach and, thus, is not compensable as such. *Id.*

Finally, the reason that Suburban's 1988 lost customer profits were even before the jury appears from the record to have been in connection with Suburban's tortious interference claim—a claim which the jury found Proctor not liable. Since these "damages" did not flow either directly or consequentially from Proctor's breach of the exclusivity clause, their award to Suburban must be vacated.

### III. *Proctor's Breach of Contract Counterclaim—Excessive Price*

■ Proctor counterclaimed against Suburban alleging that it was overcharged for gas in violation of the IDA and the Vermont Uniform Commercial Code. The district court found that the applicable IDA provision was ambiguous but then excluded extrinsic evidence said to be relevant to a reasonable profit margin for Suburban. While Proctor contends that the district court erred in this respect, we find Proctor's argument to be without merit.

In relevant part, section 4 of the IDA provides:

The price of LP–Gas sold hereunder shall be in accordance with Suburban's applicable schedule of LP–Gas rates in effect at time of sale. Said price shall be subject to change, and any price revisions

shall be fair and reasonable. Suburban shall attempt to provide [Proctor] with prompt notice of such revisions.

It was undisputed that Suburban did not have a written "applicable schedule of gas rates in effect at the time of the sale" and that the price to Proctor was left to the discretion of Suburban's Rutland manager. Proctor introduced evidence that Suburban increased its gas price profit margin from 15 cents per gallon in December, 1983 to 23.5 cents in January, 1985, without informing Proctor. At trial, Proctor claimed that the foregoing conduct both breached section 4 of the IDA and was in violation of § 2–305(2) of the Vermont Uniform Commercial Code which states that "A price to be fixed by the seller or by the buyer means a price for him to fix in good faith." 9A V.S.A. § 2–305(2).

Suburban offered, and the district court admitted, testimony from Taranovich, Proctor's president, that when the IDA was signed Suburban told him that Suburban's profit margin above cost on gas sold to Proctor would be 15 cents per gallon. Given Proctor's own expectation that Suburban would receive a 15 cent profit margin, the district court excluded as irrelevant Proctor's offered expert evidence that a reasonable price to Proctor would have been one that yielded a margin of 6 to 10 cents above the pipeline price, plus transportation and storage costs. Proctor *was* permitted to show that Suburban's margin rose to 23.5 cents during the relevant period, thereby yielding a profit above the 15 cent margin of $26,911. The jury nevertheless found that Suburban did *not* breach the IDA by overcharging Proctor at any price.

Thus, even if Proctor's evidence concerning "reasonable price" had been admitted by the district court, it merely would have affected the amount of Suburban's claimed overcharge—the difference being an overcharge based on a 6–10 cent base margin as compared to one calculated using a 15 cent base margin. In light of the fact that the jury found that Suburban *did not overcharge Proctor whatsoever*, Proctor's evidentiary objections become moot. If indeed the district judge did err in excluding the evidence, and we do not reach the question here, such error was harmless.

IV. *Proctor's Punitive Damage Claims for Fraudulent and Willful Overcharge, and the District Court's Exclusion of Related Evidence*

The jury's finding that Suburban did not overcharge Proctor is dispositive of these issues as well. Proctor argues that the district court erroneously prohibited the jury from considering its fraudulent overcharge counterclaim and its related counterclaims for punitive damages premised upon fraudulent and willful overcharge. Proctor also maintains that the district court erred in excluding documentary and testimonial evidence concerning Suburban's 1987 annual area marketing and operations plan to "weed out" certain Suburban dealers. Proctor proffered this evidence in order to buttress its counterclaims for punitive damages.

These counterclaims all share one thing in common—their viability turned upon a finding that Suburban was overcharging Proctor. Thus, the jury's finding that no breach of contract occurred due to overcharging necessarily vitiated Proctor's related fraud counterclaim. Furthermore, considering that the excluded evidence was offered to prove fraudulent and willful overcharging, even if it had been allowed in, it would have been useless to a jury unwilling to credit claims of *any* breach or *any* overcharging. Since Proctor suffered no prejudice as a result of the court's disposition of its fraudulent and willful overcharge counterclaims, we cannot fault the district court's dismissal of Proctor's claims for punitive damages on these counts.

V. *Proctor's Defamation Counterclaim for Punitive Damages*

Proctor contends that the district court improperly excluded testimony from several witnesses regarding Suburban's defamatory statements about Proctor's financial status. Furthermore, Proctor contends that the district court erred in barring the jury from considering the issue of punitive

damages arising from the defamation. At trial, Suburban conceded that it had made defamatory remarks about Proctor and confessed to damages of one dollar. Nothing in the record indicates that Proctor objected to the amount of Suburban's confession, and indeed the focus of Proctor's argument on appeal concerns its claimed right to punitive damages.

Under Vermont law, a *compensatory* award, rather than a *nominal* one, is a necessary predicate for punitive damages. *See Moore v. Duke,* 84 Vt. 401, 407–08, 80 A. 194, 197 (1911) ("exemplary damages are allowed in enhancement merely of ordinary damages"). *Cf. Lent v. Huntoon,* 143 Vt. 539, 550, 470 A.2d 1162, 1170 (1983) ("Once general (compensatory) damages are established ..., punitive damages may be awarded on a showing of actual malice."). The *Moore* case defined nominal damages as "those so small in amount as to show that they are not intended as any equivalent or satisfaction to the party recovering them." 84 Vt. at 407, 80 A. at 197. In the instant case, the one dollar confession has virtually no ability to compensate Proctor for any loss that it might have suffered, and as such is nominal. By acquiescing in what was effectively a stipulation of nominal damages, as a matter of law Proctor gave up its claim for punitive damages. The district court's exclusion of evidence relating to the defamation punitive damage claim was, therefore, entirely appropriate.

## VI. *Proctor's Clayton Act Tying Claim*

Finally, Proctor contends that the IDA's exclusivity provision requiring Proctor to install and service only Suburban equipment constituted an illegal "tying" arrangement in violation of the Clayton Act. *See* 15 U.S.C. § 14. The district court entered summary judgment against Proctor on this counterclaim, and Proctor now appeals from this judgment.

We review summary judgment *de novo. See Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.1991). Under Fed.R.Civ.P. 56(c), summary judgment should be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Bryant,* 923 F.2d at 982. "Viewing the evidence produced in the light most favorable to the nonmovant, if a rational trier could not find for the nonmovant, then there is no genuine issue of material fact and entry of summary judgment is appropriate." *Binder v. Long Island Lighting Co.,* 933 F.2d 187, 191 (2d Cir.1991) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986) and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–88, 106 S.Ct. 1348, 1355–57, 89 L.Ed.2d 538 (1986)).

In order to prove illegal "tying" a buyer must show *all* of the following elements: (1) a tying and a tied product; (2) evidence of actual coercion by the seller forcing the buyer to accept the tied product; (3) sufficient economic power in the tying product market to coerce purchaser acceptance of the tied product; (4) anticompetitive effects in the market for the tied product; and (5) the involvement of a "not insubstantial" amount of interstate commerce in the tied product. *Gonzalez v. St. Margaret's House Housing Dev. Fund,* 880 F.2d 1514, 1516–17 (2d Cir.1989); *Yentsch v. Texaco, Inc.,* 630 F.2d 46, 56–57 (2d Cir.1980). Here, Proctor failed to present any evidence in support of two of the five elements required to prove tying.

First, there was no showing of coercion; Proctor entered willingly into its agreement with Suburban in full knowledge and acceptance of its provisions. There was no indication Proctor was forced to take a product it did not want.

Second, Proctor presented no evidence regarding market power in the tying product—LP–Gas—as required by the Clayton Act. There was no showing that Suburban enjoyed power in the form of an excessively large market share, nor that Suburban sold a unique product. Proctor simply argued that Suburban retained a right to cancel the dealership contract in the event that Proctor breached it. This relates only

to an arrangement between the parties, not to the seller's power over the market.

Because Proctor failed to raise genuine issues of material fact relevant to any coercion by Suburban, and failed to present any evidence showing undue market power on the part of Suburban, we affirm the district court's decision granting summary judgment to Suburban on Proctor's claim of illegal tying under the Clayton Act.

## CONCLUSION

For the reasons discussed in this opinion we find no basis to disturb the jury's finding that Proctor breached the IDA. However, we remand with orders to vacate that part of the judgment pertaining to damages. We also see no basis to disturb the jury's finding that Suburban did not breach the agreement by overcharging Proctor, and we affirm the district court's refusal to submit to the jury Proctor's counterclaims for fraudulent and willful breach, as well as its exclusion of evidence relating thereto. Finally, we affirm the district court's refusal to submit to the jury Proctor's counterclaim for punitive damages for defamation, and its grant of summary judgment to Suburban on Proctor's federal antitrust claims.

Judgment affirmed in part; remanded in part with orders to vacate damages award.

MINER, Circuit Judge, dissenting in part:

I agree with all except Part II of Judge Walker's thoughtful and comprehensive opinion for the Court. I disagree as to Part II because it seems to me that the portion of the judgment entered in favor of Suburban in the sum of $105,378 should remain undisturbed as a proper award of consequential damages by the jury.

Vermont law permits the recovery of special or consequential damages. *Albright v. Fish*, 138 Vt. 585, 422 A.2d 250, 254 (1980); *see also Norton & Lamphere Constr. Co. v. Blow & Cote, Inc.*, 123 Vt. 130, 183 A.2d 230, 236 (1962). "[C]ausation, certainty and foreseeability" must be demonstrated to warrant the recovery of such damages. *Albright*, 422 A.2d at 254;

*cf. Norton*, 183 A.2d at 236. As the Vermont courts have put it, consequential damages will be awarded for losses that must "reasonably be supposed to have been in [the parties'] contemplation at the time [they] contracted with [each other]." *Norton*, 183 A.2d at 236; *see also In re Estate of Sawyer*, 151 Vt. 287, 559 A.2d 687, 692 (1989); *Berlin Dev. Corp. v. Vermont Structural Steel Corp.*, 127 Vt. 367, 250 A.2d 189, 192 (1968).

The issue, therefore, is whether it was foreseeable to the parties at the time of contracting that Proctor, by purchasing equipment from another source and thereby breaching the agreements, would cause Suburban to suffer the loss of customers. I think that the answer is "yes." It certainly was within the reasonable contemplation of the parties that Suburban would terminate the agreements upon the breach of a material condition—the exclusivity provision—found in both the Investment Dealer Agreement and the Exchange Cylinder Agreement. The parties further contemplated the consequences of termination, namely the potential loss of customers by Suburban. Evidence that they did so is found in the agreements themselves:

First, both agreements made it clear that all customers were Suburban customers, and the Dealer Agreement required Proctor to notify the customers of that fact. Moreover, all customer records were to be surrendered upon termination. Second, each contract contained a non-compete clause. The Cylinder Agreement prohibited the establishment of an LP–Gas distribution business within a 50–mile radius of Rutland for a period of one year after termination, and the Dealer Agreement prohibited the establishment of an LP–Gas distribution business within a 50–mile radius of Rutland for a period of three years after termination. To say that the parties did not consider the possibility that Proctor would make off with Suburban's customers upon contract termination is to ignore the bargain of the parties. Although Suburban sought to protect itself from the loss of business and Proctor understood that concern and agreed to perform accordingly,

90% of Suburban's customers in fact were lured away by Proctor.

Despite the foregoing, and despite the fact that Proctor breached the contract by purchasing equipment from another source and also violated the non-compete clause, the panel majority observes that "Proctor's violation of the exclusivity clause need not have led to Suburban's customer flight and probably would not have done so if Suburban had not exercised its discretion to terminate the agreements...." Op. at 785. The implication here is that Suburban somehow is at fault in exercising its right to terminate for cause and by reason thereof should not be entitled to appropriate consequential damages. It is not clear why this should be so.

The panel majority also observes that "Suburban's 1988 customer loss 'consequences' were, at best, only remotely caused by Proctor's breach of the *exclusivity clause*." *Id*. I do not see why the exclusivity clause should be emphasized. It does not make any difference which of the material provisions of the contract is violated. A breach of contract is a breach of contract. More importantly, it does not seem to me that causation was "remote" here or that "the chain connecting Proctor's breach and Suburban's customer loss is simply too attenuated to satisfy the causation element of consequential damages." *Id*. My view is that there was causation, albeit indirect, in the sequence of breach, termination and loss of customers and consequent loss of profits. It was the loss of profits that Suburban would have made on the departed customers for a period of one year that the jury properly awarded. To say that the damages found by the jury were intended as compensation on the tortious interference claim that was rejected by the jury, *see Id*. at 786, is to conclude that the verdict was inconsistent. There is no basis for us to make such a determination.

The venerable rule of *Hadley v. Baxendale*, 9 Exch. 341, 156 Eng.Rep. 145 (1854), known to generations of law students, may live on in Vermont law, *Albright*, 422 A.2d at 254, but it is inapposite here. While the carrier in *Hadley* had no inkling of the consequence of his failure to transport the broken millshaft, Proctor knew full well that it would make every effort to find another supplier and garner the Suburban customers when it caused the agreements to be terminated by virtue of its own substantial breach. The loss of customers was a circumstance of special concern to Suburban. Indeed, in view of the competition in the industry and Suburban's lack of market power, a fact we recognize in Part VI of this opinion, it had to be of paramount importance. Where, as here, "[the] special circumstance is brought to the attention of the other party, damages normally flowing from a breach of the contract in view of such special circumstances are said to be within the contemplation of the parties." *Christensen v. Slawter*, 173 Cal.App.2d 325, 343 P.2d 341, 346 (1959). Accordingly, I am of the opinion that the consequential damages awarded by the jury were justified in this case and disagree with my colleagues to the extent that they hold otherwise.