Patricia BARON, et al., Plaintiffs,

v.

**PORT AUTHORITY OF NEW YORK AND NEW JERSEY, Defendants.**

Nos. 96 CIV. 7007, 96 CIV. 7010, 96 CIV. 7011, 96 CIV. 7012.

United States District Court,
S.D. New York.

July 18, 2000.

Steve S. Efron and Renee L. Cyr by Steve S. Efron, New York City, for Plaintiffs.

Janet E. Charles, Milton H. Patcher by Megan Lee, New York City, for Defendants.

## OPINION

MOTLEY, District Judge.

Plaintiffs, Patricia Gayle Baron, Lisa Diaz, Laura Toole and Amos Ilan, filed separate wrongful discharge complaints against their former employer, the Port Authority of New York and New Jersey, and its Commissioners and Chief Officers, A. Paul Blanco, Richard Codd, Louis J. Lacapra, Kathleen Donovan, Charles Gargano, Lewis Eisenberg, James Hellmuth, Henry Henderson, Robert Janiszewski, Peter Kalikow, George O'Neill, Alan Philibosian, Melvin Schweitzer, Vincent Tese and Frank Wilson, on September 13, 1996. The complaints alleged violations of (1) 42 U.S.C. § 1983 ("1983") for infringement of property, due process, equal protection and contract rights, (2) 42 U.S.C. § 2000e et seq. and 42 U.S.C. § 1981(a), Title VII and the Civil Rights Act of 1991 for discrimination based on sex, (3) the Age Discrimination in Employment Act ("ADEA") for age discrimination, (4) New York Human Rights Law, New York State Executive Law § 296 ("HRL") for discrimination based on age and sex, (5) N.J.S.A. 10:5–1 to 10:5–42, the New Jersey Law Against Discrimination ("LAD"), for age and sex discrimination and (6) New York and New Jersey common law of contracts. Pursuant to the court's order of December 12, 1996, plaintiffs' cases were consolidated.

On February 17, 1997, defendants filed a motion for partial summary judgment as to all claims asserted against the Port Authority Commissioners ("Commissioners"), as to the § 1983 claims of deprivation of contract, property and due process rights against all defendants and as to the Title VII and ADEA claims against the supervisors and the Port Authority. In a Memorandum Opinion of June 29, 1997, this court granted defendants' partial summary judgment motion as to the Title VII and ADEA claims and as to the HRL and LAD claims. *Baron, et al., v. Port Authority of New York and New Jersey, et al.*, 968 F.Supp. 924 (S.D.N.Y.1997). In a September 5, 1997 Memorandum Opinion, the court granted defendants' partial summary judgment motion with respect to the § 1983 procedural due process claims and the claims asserted against defendant Commissioners in their personal and official capacities. *Baron, et al. v. Port Authority of New York and New Jersey*, 977 F.Supp. 646 (S.D.N.Y.1997). On January 22, 1999, plaintiffs filed a stipulation of discontinuance withdrawing all equal protection claims against defendants. On December 27, 1999, the remaining defendant, the Port Authority of New York and New Jersey, filed a motion for partial summary judgment with respect to plaintiffs' remaining claims, those for common law breach of contract and § 1983 deprivation of Contract Clause rights. This court now grants defendant's motion, dismissing plaintiffs' contract claims under the common law of New York and New Jersey and § 1983, thereby dismissing plaintiffs' case in its entirety. The court assumes familiarity with the prior proceedings in this case and only discusses those facts pertinent to the matter immediately before the court.

## FACTUAL BACKGROUND

### I. THE PARTIES

Plaintiffs are New York citizens who were terminated from their respective positions by defendants pursuant to a reduction in force ("RIF") on September 15, 1995.

Defendant Port Authority of New York and New Jersey (the "Port Authority") is a bi-state agency created by Compact in

1921 between the States of New York and New Jersey to develop terminal, transportation and other facilities of commerce within the Port of New York District.

## II. THE DISPUTE

### A. Plaintiffs' Allegations

Plaintiffs allege that when they interviewed with, were hired by, and worked for the Port Authority, they were continuously informed and reassured that the Port Authority maintained a policy of staff retention. Plaintiffs allege that they rejected other job offers in choosing or remaining with the Port Authority due to the assurances regarding the Port Authority's policy of staff retention. The plaintiffs did not enter into written employment contracts with defendant Port Authority.

Plaintiff Patricia Baron accepted a position with the Port Authority in 1966. Baron alleges that during her interviews, Port Authority managers made statements with respect to their job security policy, ensuring her that the Port Authority was a "career service agency," that the only way she could lose her job was by doing something inappropriate, that employees would be "judged based on their performance and longevity within the agency" and that employment decisions would be guided by "merit and length of service." Pl's Mem. Opp'n Summ. J. at 3. Baron also alleges that when she as given the personnel manual, the Guide for Port Authority Personnel, she was instructed to read it because it contained the basic rules governing her employment. *Id.* at 4. In addition, Baron alleges that she rejected outside job offers during her tenure with the Port Authority because she believed that her seniority made her job secure. *Id.* at 6.

Plaintiff Amos Ilan accepted a position with the Port Authority in 1970. In accepting the Port Authority position, Ilan alleges that he turned down an outstanding job offer. During his interviews at the Port Authority, Ilan alleges that he was told that he could expect to have a "job for life," that the Port authority was "run as a true meritocracy, in which advancement,

salary increases and other employment decisions were based strictly on ability, dedication and length of service," and that the Port Authority wanted a "career work force." *Id.* at 7.

Plaintiff Laura Toole left her job after receiving an employment offer from the Port Authority in 1984. *Id.* at 9–11. She claims in accepting the offer, she rejected an offer of an increased salary with her current employer in favor of the Port Authority position, which paid at a lower salary rate. *Id.* at 11. Plaintiff alleges that she was told by managers in her interviews that the Port Authority had a tradition of "career service" and of "people working at the Port Authority until they retired." According to Toole, the managers spoke of the significance of seniority, and assured her that "you have to be a criminal to leave here." *Id.* at 10. In 1989, during a reduction in force ("RIF"), Toole requested a copy of the Port Authority Instructions (" PAI's") governing RIF's. *Id.* at 11–12. An administrative assistant in her department gave her a copy of the relevant PAI's. *Id.* at 12. In 1993, Toole alleges that she rejected an outside job offer based on the her understanding of the PAI's and her managers' oral assurances of job security. *Id.* at 12.

Plaintiff Lisa Diaz left her job in 1987 to join the staff of the Port Authority after receiving a call from a Port Authority manager offering her a position with the Port Authority. *Id.* at 12–13. During her interviews, Diaz claims that managers assured her that "only through some misconduct or some malfeasance would one be in jeopardy of their position," that Port Authority employees have "the equivalent of tenure" and that "the opportunity for someone to be fired was extremely remote except for . . . misbehavior or other improper action." *Id.* at 13. With respect to RIF's, Diaz claims that during her interview, in a discussion about "redeployment" policies and "excess staff," she was told that "people could either make career changes [or] have other opportunities at

the Port Authority." *Id.* at 14. Diaz also alleges that during her employment, she had a discussion regarding pending legislation with the Port Authority's general counsel in which she was told that since the Port Authority was large, that it "had the ability to absorb many changes" in the event of a RIF. *Id.* at 15. Diaz claims that she rejected offers for other jobs paying higher salaries during her tenure, preferring the Port Authority because of her understanding of the Port Authority's job security policy. *Id.* at 15–16.

**B. Port Authority Reduction in Force Policies**

Plaintiffs base their claims on two Port Authority policies relating to RIF's: (1) the Guide for Port Authority Personnel, Tenure of Office and (2) Port Authority Instructions ("PAI's") 20–1.12.

At or about the time Baron was hired, the Port Authority issued a booklet entitled "Guide for Port Authority Personnel," (the "Guide") which Baron claims was given to her on her first day of work. Pls'. Mem. Opp'n to Summ. J. at 4; Def's Rule 56.1 Stmt. ¶ 8. The Guide was not issued when the other plaintiffs were hired. Def's Rule 56.1 Stmt. ¶ 8. The Guide includes an explanation of the Port Authority's RIF policies, stating that seniority and merit will be considered in RIF decision-making and that the Port Authority will attempt to reappoint laid off personnel. *Id.* Regarding seniority and merit considerations, the Guide states, "[i]n the event of any reduction in the work force merit and ability as well as length of services and salary step will [be] considered in deciding how the reduction will be accomplished." *Id.* Ex. D at 66. As to seniority specifically, the Guide states that "[g]enerally, only staff members with relatively short Port Authority service in the lower salary-range steps will be laid off." *Id.* With respect to reappointment, the Guide provides, "the Port Author[ity] will make every reasonable effort to place the employees affected [in] vacant positions elsewhere in the Port Authority," and that "[i]t is also a basic Port Authority policy that

any employee who, as a result of a reduction in force, is either placed in a position with a lower salary or temporarily laid off will be given preferred consideration for reappointment to a position in his old class." *Id.* The introduction to the Guide indicates that the statements are not rules, and are subject to change:

> This booklet is called a guide, rather than a rule book, because it is just that—a guide to help you become familiar with the more important features of the Port Authority's personnel policies. In times to come, some of the policies and procedures in the following pages may be changed to fit new situations. The basic idea behind them, however, will never change."

Def's Rule 56.1 Stmt. Ex. D at 2.

The Port Authority Instructions is a manual which details Port Authority administrative policies and procedures. The introductory section of the manual describes the purpose of the PAI's, stating that:

> PAI's are not intended to create any rights or presumptions in favor of any persons or to impose any standards or obligations on the Port Authority for the benefit of any persons but are solely for internal Port Authority guidance. They are subject to modification, in general or for any particular instance and retroactively or otherwise, in the discretion of the Executive Director.

*Id.* Ex. C. According to defendants, the PAI's were extensive, multi-volume documents which were only distributed to division and department heads, supervisors and the Port Authority Library, which was open to all Port Authority employees. Employees, however, were encouraged to refer to the PAI's whenever they had a question concerning Port Authority policies, rules or procedures. *Id.*

In 1975, the Port Authority adopted PAI 20–1.12 governing RIF's due to "[r]eorganization or reduction in personnel (in whole or in part) in the interest of efficiency, economy or otherwise." *Id.* Ex. E. The

PAI provided that the termination of professional and managerial employees would be based on seniority and performance. *Id.* The PAI also provided professional and managerial employees with transfer, reassignment and retreat rights. *Id.* These rights gave individuals with the most seniority and similar performance ratings the right to displace other individuals in the same specialty, giving employees "bumping rights" in the event of a reduction in force. *Id.* In 1989, PAI 20–1.12 was amended to eliminate the bumping rights, instead providing that terminations pursuant to a RIF would be based on seniority and merit. *Id.* Ex. F.

On September 7, 1995, the Commissioners met and adopted a resolution directing department directors to terminate managerial employees in the exercise of "sound business and policy discretion of management" to effectuate a RIF. The Commissioners resolved to eliminate considerations of seniority and merit in favor of efficiency, providing that:

> In lieu of the present procedures which specify that department directors must use, in deciding on an order of termination of employment of the incumbents in positions to be abolished, performance appraisals and Port Authority seniority, the new procedures would permit the exercise of the sound business and policy discretion of management, for the improved effectiveness and efficiency of the Port Authority, to determine which employees' services are to be terminated.

*Id.* Ex. H. PAI 20–1.12 was thereby amended, such that, "[e]ach affected department director, consistent with sound business and policy discretion and in order to improve effectiveness and efficiency of the Port Authority, identifies the particular employees who are subject to involuntary removal[.]" On September 15, 1995, pursuant to the 1995 Resolution and RIF procedure, 316 permanent positions were eliminated, including plaintiffs'.

## DISCUSSION

### I. SUMMARY JUDGMENT STANDARD

A grant of summary judgment is proper where, viewing the evidence in the light most favorable to the non-movant, the court can determine that "there is no genuine issue of material fact and the mov(ant) is entitled to judgment as a matter of law." *Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992); *see also Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). To defeat a motion for summary judgment, the non-movant must present evidence from which a reasonable jury could find in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### II. PLAINTIFFS' COMMON LAW CONTRACT CLAIM

#### A. Applicable State Law

In the complaint, plaintiffs allege common law contract causes of action based on both New York and New Jersey law. In their brief, plaintiffs rely solely on New York law, and refer only to their New York contract law claim. In defendant's brief, defendant suggests that New Jersey law is inapplicable without citing any legal authority. In cases where jurisdiction is based on diversity of citizenship as well as the presence of a federal question, district courts follow choice of law rules of the forum state, in this case, New York. *See Totalplan Corporation of America v. Colborne,* 14 F.3d 824, 832 (2d Cir.1994); *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). When the case involves substantive issues of law such as contract formation, New York courts "give 'controlling effect to the law of the jurisdiction which has the greatest concern with, or interest in, the specific issue raised in the litigation.'" *Totalplan,* 14 F.3d at 832 (quoting

*Intercontinental Mon. Corp. v. Performance Guar.,* 705 F.Supp. 144, 147 (S.D.N.Y.1989)). In the instant case, New York has the greatest interest in the outcome of the case because the plaintiffs are New York residents and the actions giving rise to plaintiffs' claims occurred in New York. *See, e.g., Petr Blahout Corp. v. D'Agostino,* 256 A.D.2d 217, 218, 683 N.Y.S.2d 10 (1998). Accordingly, the court will apply New York common law to plaintiffs' contract claims.

## B. New York Common Law Governing Implied Employment Contracts

### 1. Rebuttable Presumption of At–Will Employment under New York Law—*Weiner* and *Murphy*

 It is a well settled proposition of New York law that employment for an undetermined period of time is presumed at-will, and may be terminated at any time for any reason or for no reason whatsoever. *See Martin v. New York Life Insurance Co.,* 148 N.Y. 117, 42 N.E. 416 (1895); *Sabetay v. Sterling Drug,* 69 N.Y.2d 329, 333, 514 N.Y.S.2d 209, 506 N.E.2d 919 (1987). This presumption may be rebutted, however, if plaintiff establishes an implied contract demonstrating a limitation on the employer's right to discharge. The New York Court of Appeals established this rule in *Weiner v. McGraw–Hill,* 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982), where the court found that the determination of whether the at-will presumption is rebutted depends on "[n]ot . . . subjective intent, nor 'any single act, phrase or expression', but 'the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to obtain', which control." *Id.* The New York Court of Appeals further refined the standard for overcoming the at-will presumption in *Murphy v. American Home Products Corp.,* 58 N.Y.2d 293, 461 N.Y.S.2d 232, 448 N.E.2d 86 (1983), where the court found that "general references" to an employer's manual were insufficient to state a cause of action under *Weiner,* and that absent "[a]n express limitation in the indi-

vidual contract of employment, an employer's right at any time to terminate an employment at will remains unimpaired." *Id.* at 305, 461 N.Y.S.2d 232, 448 N.E.2d 86.

### 2. Applicability of *Weiner* and *Murphy* to RIF Policies

Most implied employment contract cases are based on promises not to discharge without just cause. Plaintiffs' claim in the instant case, however, is that the Port Authority, through both oral and written assurances, promised to consider seniority as a factor in terminations instituted pursuant to a RIF. The Second Circuit, when following New York law, has applied the *Weiner* and *Murphy* rebuttable presumption analysis to RIF policies.

In *Gorrill v. Icelandair/Flugleidir,* 761 F.2d 847 (2d Cir.1985), the Second Circuit found that based on the totality of the circumstances, a personnel manual setting a discharge policy coupled with oral assurances that the manual is controlling creates a binding contract under *Weiner. Id.* at 852. The court found that the policy statement in the personnel manual coupled with the "repeated oral and written assurances from the employer that the Operations Manual contained the terms and conditions of employment and was controlling," created a binding contract limiting the employer's right to discharge plaintiff employees. *Id.* The court also found that employee plaintiffs provided adequate consideration under *Weiner* by continuing to render services to the defendant employer. *Id.*

In *Mycak v. Honeywell, Inc.,* 953 F.2d 798 (2d Cir.1992) the Second Circuit found that under *Weiner,* detailed job security provisions stated in "mandatory and unqualified terms" creates an "express limitation" on an employer's right to discharge its employees despite qualifying language included in the manual. The plaintiff employee in *Mycak* was hired in 1969, and the employee manual was updated in 1975 and 1981. *Id.* at 799. Both updates in-

cluded a job security policy which detailed reduction in force provisions. *Id.* at 799–800. The 1975 version stated that the manual "governed" employer-employee relations. *Id.* at 800. The 1981 version excluded that statement, instead stating that the manual "defines and interprets" the employer-employee relationship, adding that the manual was not "an all-inclusive source of [defendant's] information" and was "not intended to be a complete policy manual," and further providing that "[w]hile the stated policies will be applied to the extent possible, in the final analysis, the specific judgment and discretion will govern." *Id.* The court held that the job security policy imposed an "express limitation" upon defendant employer's right to discharge plaintiff employees, finding that "[t]he policy sets forth a very specific and detailed procedure for work force reduction in mandatory and unqualified terms." *Id.* at 802. As to the language of qualification included in the 1981 updated manual, the court held that this did not negate the binding force of the specific job security provisions because a similar clause was not controlling in *Weiner.* *Id.* at 802.

### 3. Plaintiffs Have Failed to Demonstrate Implied Employment Contracts

Plaintiffs claim that the Port Authority is bound by an implied promise to consider seniority in RIF termination decisions. It is undisputed that the parties did not sign an employment contract and that plaintiffs are at-will employees. According to plaintiffs, the oral assurances made to them before and during their employment, the PAI's and, in Baron's case, the personnel manual, together created an implied contract of employment because they assured that seniority would be considered in RIF discharge decisions. Plaintiffs maintain that the Port Authority breached that implied contract by changing the RIF policy to replace seniority considerations with "sound business and policy discretion" and thereafter discharging plaintiffs in a RIF without considering their seniority. Plaintiffs thus claim that the RIF policies stated

orally, in the PAI's and in the personnel manual precluded the Port Authority from terminating them based solely on "business and policy discretion" concerns rather than seniority.

As stated above, under New York common law, in order to rebut the presumption of at-will employment and find limitations exist an employer's ability to terminate its employees, the plaintiff must show (1) "an express limitation on the individual contract of employment" *Murphy,* 58 N.Y.2d at 305, 448 N.E.2d 86 and (2) "sufficient evidence of a contract and a breach" based on the totality of the circumstances *Weiner,* 57 N.Y.2d at 466, 457 N.Y.S.2d 193, 443 N.E.2d 441.

■ As to the first matter, determining whether an express limitation exists, the Second Circuit has found that under New York law, a provision which sets forth a "very specific and detailed procedure" and is stated in "mandatory and unqualified terms" imposes an "express limitation on the employers right to discharge." *Mycak,* 953 F.2d at 802. As for the second concern, whether evidence of a contract and breach exists, the Second Circuit, applying New York law, has found that once plaintiff has pointed to an "express limitation," plaintiff then must present evidence from which a factfinder could find "[a] binding contract [based on] the actions of the parties with respect to those provisions." *Gorrill,* 761 F.2d at 851. The court finds that plaintiffs have failed to demonstrate that an implied contract exists with respect to the RIF provisions of the PAI's and the Guide.

#### a. Patricia Baron

The court finds that Baron's claim of breach of an implied employment contract fails. Baron premises her claim upon promises made orally in her interviews and in writing in the Guide and in the PAI's. With respect to the oral assurances, plaintiff points to statements such as "the Port Authority is a career service agency" and

"employees will be judged based on their performance and longevity." As for the statement in the Guide, the relevant provision states that "[i]n the event of any reduction in the work force merit and ability as well as length of services and salary step will [be] considered in deciding how the reduction will be accomplished." Both the 1975 and the 1989 PAI's, upon which plaintiffs base their claims specifically state that RIF discharge decisions will be based on "seniority and merit."

First, addressing whether plaintiff has demonstrated an "express limitation," the court finds that Baron has satisfied this requirement. Both the Guide and the PAI's state in mandatory and unqualified terms that seniority will be considered in RIF decisions. Defendants argue that both documents include separate clauses stating that all rules are subject to change and that they do not create any rights in favor of any party. Such a qualifying phrase, however, as the court found in *Mycak*, is not controlling. *See Mycak*, 953 F.2d at 802 ("[t]he Handbook's language of qualification...had a counterpart in Weiner...and therefore does not negate the binding force of the Handbook's more specific provisions under New York law").

With respect to the second issue, whether a factfinder could conclude that a binding contract exists based on the actions of the parties with respect to the limitation, the court finds that Baron has failed to make a sufficient showing. Baron alleges that on her first day of work at the Port Authority, she was given a copy of the Guide and was told to read it because it contained the basic rules governing her employment. Unlike *Gorrill*, where the Second Circuit found an implied contract based on an express limitation in a personnel manual and "repeated oral and written assurances from the employer that the Operations Manual contained the terms and conditions of employment and was controlling" *Gorrill*, 761 F.2d at 851, Baron only points to a single general statement that the Guide included the basic rules governing employment.

As for the PAI's, the PAI's were not treated as a personnel manual. They were only distributed to division and department heads and supervisors. A copy was kept in the library, but was not given to the general population of employees. Baron does not allege that she was made aware of the PAI's before or during her employment. Thus, taken together, the course of conduct between Baron and the Port Authority does not support a rational finding that an implied contract exists based on the Guide, PAI's or the oral statements made during her interviews.

### b. Amos Ilan

The court finds that plaintiff Ilan's claim of an implied employment contract fails. Plaintiff Ilan relies on oral assurances made by managers during the interview process and on the PAI's in his implied contract claim. The oral assurances which Ilan claims he was given were that he could expect to have a "job for life," that the Port Authority was a "true meritocracy, in which advancement, salary increases and other employment decisions were based strictly on ability, dedication and length of service," and that the Port Authority wanted a "career work force."

Having found that the PAI's include an "express limitation," the court turns to the conduct of the parties in determining whether an implied contract exists. Ilan, however, has failed to show that the PAI's and the oral assurances made during his interviews create an implied contract exists respect to the PAI's. The oral assurances which Ilan alleges were made during his interviews do not specifically relate to RIF procedures or the PAI's. In fact, Ilan does not allege that he was ever aware of the PAI's granting him seniority rights in the event of a RIF. Also, as stated above, the PAI's were only distributed to a limited group of high level employees. Thus, upon examining the course of conduct between plaintiff Ilan and the Port Authority, the court finds that Ilan has failed to present a reasonable basis for a implying a contract limiting the Port Authority's discharge rights.

#### c. Laura Toole

The court finds that Toole has not made a satisfactory showing that an implied employment contract exists. Toole bases her claim on oral assurances and the PAI's. She claims that she was assured that "people work[ ] at the Port Authority until they retire[ ]," that seniority was significant, and that Port Authority had a tradition of "career service." In addition, Toole alleges that she read over the PAI's relating to reductions in force in 1989, and that she later rejected an outside job offer based on her understanding of the Port Authority's policies.

Given the "express limitation" presented in the PAI's, the court turns to whether Toole has demonstrated that the course of conduct between the parties creates a binding contract. The court finds that she has not. Toole does not allege that she was given anything more than generalized assurances of job security before deciding to accept a job with the Port Authority. She does not allege that any representations with respect to RIF"s were made during her interviews. Toole does claim, however, that she read the RIF PAI's in 1989 after working for the Port Authority for several years, and that she later rejected subsequent outside job offers based on her understanding of the policy. However, Toole does not show that she was given any assurances from the employer that the PAI's were controlling. *See, e.g., Gorrill,* 761 F.2d 847. Looking at the totality of the circumstances, thus, the court finds that the course of conduct between Toole and the Port Authority does not demonstrate that a binding contract existed between the parties.

#### d. Lisa Diaz

The court finds that Lisa Diaz's claim of implied employment contract fails. Plaintiff Diaz bases her claim on the PAI's and oral assurances given in her interview and while she was employed at the Port Authority. Plaintiff Diaz alleges that during her interviews, she was assured that "only through...malfaesance would one be in jeopardy of their position" and that employees "have the equivalent of tenure." With respect to RIF's, Diaz alleges that the managers assured her that "people could either make career changes [or] have other opportunities at the Port Authority." Diaz alleges that she was also given assurances while she was employed with the Port Authority, that the Port Authority "had the ability to absorb many changes."

Despite the "express limitation," Diaz has failed to show that an implied contract existed with respect to the PAI's in question. The oral assurances cited by Diaz are both vague and generalized, and present no basis for finding that the Port Authority promised or induced plaintiff in any way. Furthermore, Diaz does not allege that she was ever made aware of the PAI or its RIF provisions. Based on the evidence that plaintiff Diaz presents, the actions of the parties do not support a finding of a binding contract with respect to the PAI's RIF provisions.

### III. PLAINTIFFS' § 1983 CLAIM FOR DEPRIVATION OF CONTRACT RIGHTS

Given that the court has found that plaintiffs do not have enforceable contracts under New York common law, the court holds that as a matter of law, plaintiffs claim under 42 U.S.C. § 1983 for violation of the Contract Clause, Art. 1, § 10 of the Constitution fails. *See, e.g., United States Trust Co. of New York v. New Jersey,* 431 U.S. 1, 17, 97 S.Ct. 1505, 52 L.Ed.2d 92 (1977) ("It has been long established that the Contract Clause limits the power of the States to modify their own contracts as well as to regulate those between private parties.").

### CONCLUSION

For the reasons set forth herein, this court grants defendant's partial motion for summary judgment as to plaintiffs' common law breach of contract claim and as to plaintiff's Contract Clause claim. Accordingly, plaintiffs' claims are hereby dismissed with prejudice.

## ORDER

In accordance with the Opinion filed simultaneously herewith, Defendant's Motion for Partial Summary Judgement is granted. Plaintiff's common law contract and Contract Clause claims are hereby dismissed with prejudice.

SO ORDERED.