**EDO CORPORATION**

v.

**NEWARK INSURANCE CO., et al.**

**Civ. No. H–90–951 (AHN).**

United States District Court,
D. Connecticut.

Feb. 16, 1995.

See also, 145 F.R.D. 18.

John B. Beringer, Anderson, Kill, Olick & Oshinsky, P.C., New York City and John W. Colleran, Colleran & Carboni, P.C., New Haven, CT, for plaintiff.

Louis B. Blumenfeld, Cooney, Scully and Dowling, Hartford, CT, Robert L. Joyce, Wilson, Elser, Moskowit, Edelman & Dicker, New York City, Bruce M. Engel, Blatt, Hammesfahr & Eaton, and Daniel G. Joran, Caron & Fitzgerald, Chicago, IL, for defendants.

## RULING ON THE INTERPRETATION AND APPLICATION OF DEFENDANTS' POLICIES' POLLUTION EXCLUSION CLAUSES

NEVAS, District Judge.

Plaintiff EDO Corporation ("EDO") commenced this declaratory judgment action against primary insurers, Newark Insurance Co. ("Newark") and Aetna Insurance Company ("Aetna") and against excess insurers Burnhope and Companies ("Burnhope") and American Insurance Company ("American") (collectively "the insurers"), seeking a declaration that it is entitled to insurance coverage for expenditures it incurred in connection with environmental contamination.

The final determination of whether the insurers owe EDO the duties of defense and indemnification turns upon several issues and all of the parties have filed motions for summary judgment, each on multiple grounds.[1] Pursuant to an agreement between the court and the parties, however, the sole issue now before the court is the interpretation to be accorded the insurance policies' pollution exclusion clauses and the application of the policies to the undisputed facts. Therefore, the court does not, at this time, decide the dispositive issue: whether the insurers are required to defend and/or indemnify EDO.[2]

1. These motions [docs. ## 183, 188, 191] have been denied without prejudice to renewal pending the court's ruling on the later-filed motions for summary judgment [docs. ## 202, 204, 225, 226] which seek judgment based solely on the ground that the pollution exclusion clauses preclude coverage. The court does not, at this time, rule on any of the pending motions for summary judgment as it wishes additional briefing on several points. (*See* Order signed this date.)

2. The insurers argue that if the court adopts their interpretation of the pollution exclusion clauses they will necessarily be entitled to summary

## STANDARD

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). A court must grant summary judgment " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact....' " *Miner v. Glen Falls*, 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). A dispute regarding a material fact is genuine " 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510), *cert. denied*, —— U.S. ——, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich*, 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). *See also Suburban Propane v. Proctor Gas, Inc.*, 953 F.2d 780, 788 (2d Cir.1992).

## FINDINGS OF FACT

Keeping this standard in mind, the court finds the following facts to be undisputed.

Newark issued ten successive primary Comprehensive General Liability ("CGL") policies to EDO, which together cover the period from December 31, 1972 through December 31, 1982. (*See* Andrako Aff. ¶ 3 [doc. # 231].) These policies provide insurance coverage for "all sums which the insured shall become legally obligated to pay as damages because of bodily injury or property damage to which this insurance applies, caused by an occurrence." (*Id.* ¶ 11.) Each of Newark's policies also excludes coverage for "bodily injury or property damage arising out of the discharge, dispersal, release or escape ... of pollutants" unless such "discharge, dispersal, release or escape is sudden and accidental." (*Id.* ¶ 10.)

Aetna issued CGL or excess policies to EDO for the policy years of December 31, 1980–1981; December 31, 1982–December 31, 1983; December 31, 1983–December 31, 1984; and December 31, 1984–December 31, 1985. (*See* Velez Aff.Exs. A–J [doc. # 196].) All of these policies contain the "sudden and accidental" exception to the pollution exclusion clause. (*See id.* Exs. A–E, G–I.) Aetna also issued CGL and excess insurance policies to EDO for the policy year December 31, 1985–1986 ("the 1986 policies"). (*Id.* Ex. F, J.) The 1986 policies contain an "absolute" pollution exclusion; they exclude coverage for "bodily injury or property damage arising out of the actual, alleged or threatened dis-

---

judgment in their favor. (*See* Tr.Oral Argument, Apr. 4, 1994, at 6 [doc. # 240].) Newark and Aetna, the insurers whose policies provide for a defense obligation, also argue, however, that "the duty to defend ... is not properly before the court at this time." (*Id.*)

Newark and Aetna are mistaken if they mean to argue that a determination of whether or not the pollution exclusions exclude coverage is dispositive of the question of whether they owe EDO the duty to defend. (*See id.* ("It is our position ... that there being no coverage, there would be no duty to defend....").) The question of whether the insurers owe a duty to defend depends not on the facts as the court finds them but on the allegations of the underlying EPA complaint, *see, e.g., City of West Haven v. Liberty Mut. Ins. Co.*, 639 F.Supp. 1012, 1017 (D.Conn. 1986) (Daly, C.J.), or perhaps, as EDO argues, the EPA's PRP letter or Special Notice letter.

For the court to be able to dispose of the pending motions for summary judgment [docs. ## 202, 204, 225, 226], it must address the duty to defend and the duty to indemnify. Thus, by separate Order signed this date, the court has requested additional briefing limited to the question of the effect of the court's interpretation of the pollution exclusion clauses, as set forth in this Ruling, on the insurers' respective duties to defend and/or indemnify EDO.

charge, dispersal, release, escape or contamination by pollutants." (*Id.* Ex. F, J.)

American issued to EDO three excess policies providing EDO with coverage from January 1, 1978 through January 1, 1980. (Jordan Aff.Exs. A–C [doc. # 208].) Burnhope issued excess policies to EDO between 1974 and 1980. (Whiting Aff.Ex. 1, 2 [doc. # 206].) These excess policies confer upon the insurers the duty to indemnify EDO, but exclude coverage for personal injury or property damage "caused by seepage, pollution or contamination" unless "such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this Insurance." (*See, e.g.,* Jordan Aff. ¶ 7.)

From 1973 to 1985, EDO's former Electric Indicator Company, ELINCO, occupied a facility at 272 Main Avenue, Norwalk, Connecticut. (Berringer Supp.Aff.Ex. 1 (Hegarty Aff. ¶ 6) [doc. # 235].) ELINCO used trichloroethylene ("TCE") in its manufacturing process to degrease parts. (Joyce Aff.Ex. 25 (Lender Aff. at ¶ 5) [doc. # 232].) New TCE solvent was delivered to ELINCO's solvent storage tank, located outside of the facility. (Berringer Supp.Aff.Ex. 2 (Lender Depo. at 87).) The solvent was thereafter pumped from the storage tank into a degreasing unit in the manufacturing area. (*Id.* at 131, 134, 162–63.) When dirty, the TCE solvent was pumped into 55 gallon drums. (*Id.* at 84, 113, 212.) Until June of 1983, these drums were stored outside of the ELINCO building in the waste storage area. (Joyce Aff.Ex 5.)

In 1975, it was discovered that the Kellogg–Deering Well Field ("KDWF"), a nearby public water supply, was contaminated with trichloroethylene ("TCE"). (*Id.* Ex. 1.)

In June of 1983, the Connecticut Department of Environmental Protection ("CDEP") performed an on-site hazardous waste inspection of the ELINCO facility at 272 Main Avenue. (*See id.* Ex. 16.) The investigator "discovered that several storage drums were leaking." (*Id.*) The investigator also found that EDO had "historical problems" with waste handling and storage, including "10 years of waste trichloroethylene in drum storage." (*Id.* Ex. 31.)

Subsequently, CDEP issued an abatement order requiring EDO to "[i]nvestigate the extent and degree of groundwater, surface water and soil contamination resulting from chemical storage, handling and disposal activities at 272 Main Avenue, Norwalk, Connecticut." (*Id.* Ex. 8.) In its Finding in Support of Pollution Abatement Order, the CDEP recorded its assessment that there · were "serious problems with the trichloroethylene drum storage in rear of building with evidence of leakage and/or spillage," which the CDEP investigator surmised "may have existed since 1973 when [ELINCO] began operations at this site." (*Id.* Ex. 31.) The CDEP reiterated the finding of leakage and spillage problems at the "bulk storage tank for trichloroethylene at back of building" (*id.*), and specifically noted that there were "leaking drums to ground" and that TCE was stored in a tank that "shows signs of spill." (*Id.*)

EDO retained HRP associates ("HRP") as consultants to determine the "nature and extent of soil, ground water and surface water contamination possibly related to chemical storage and handling at the ELINCO Division facility." (*Id.* Ex. 14.) On August 29, 1984, HRP submitted to the CDEP a Hydrogeologic and Engineering Report. (*Id.* Ex. 5.) The 1984 report concluded that "some leakage and spillage [of TCE] has occurred over time." (*Id.*) The 1984 report also disclosed TCE contamination in the soil and groundwater and concluded that the potential sources of this contamination "include or might include" ELINCO's waste storage area, virgin solvent storage tank, the degreasing process area within the ELINCO manufacturing building, the historic raw material storage and waste storage and disposal practices of former occupants of the ELINCO building, and floor drain discharges from the ELINCO Building. (*Id.*)

In July of 1986, the Environmental Protection Agency ("EPA"), issued a letter to EDO, naming EDO a "potentially responsible party" for the contamination at the KDWF. (Berringer Supp.Aff. Ex. 7) ("PRP letter"). The PRP letter stated that the EPA "has reason to believe that the EDO Corporation through its ELINCO Division was the opera-

tor of the facility ... at ... 272 Main Avenue in Norwalk, Connecticut" and "has determined that a release of hazardous substances ... has occurred at the above-mentioned facility." (*Id.*) The letter also stated that, "[a]t the present time, trichoroethylene [sic] (TCE), as well as other chemicals, is contaminating the groundwater aquifer underneath the above mentioned facility." (*Id.*)

In May of 1990, EDO received a Special Notice Letter from the EPA demanding that EDO conduct remediation of the KDWF site, and reimburse the EPA for its past costs associated with the investigation of that site. (*See* Berringer Supp.Aff.Ex. 9.) In February of 1991, the EPA filed suit against EDO and others, seeking to recover costs incurred in response to the releases of hazardous substances detected at the KDWF. (*Id.* Ex. 11.)

EDO subsequently entered into a settlement and consent decree with the EPA, which was approved by this court on November 25, 1992. (*Id.* Ex. 10.)

## DISCUSSION

The insurance policies before the court contain three types of pollution exclusions. All of the policies issued by Newark and all of the policies issued by Aetna except those it issued in 1986, exclude damages from pollution unless the discharge of pollutants was "sudden and accidental." The Aetna policies for the policy year December 31, 1985 through December 31, 1986, by contrast, contain the so-called "absolute" pollution exclusion. A third variety of exclusions is found in the excess insurance policies issued by American and Burnhope. These policies exclude damages caused by pollution unless the discharge of contaminants was "sudden, unintended and unexpected."

Before it turns to interpret these pollution exclusions, the court must make two preliminary determinations. It must first consider whether New York or Connecticut law will govern its interpretation of the pollution exclusions and it then must decide whether the burden of proving the applicability of any exceptions to the pollution exclusions rests with the insurers or with EDO.

### A. Choice of Law and Burden of Proof

#### 1. Choice of Law

The interpretation of the defendants' insurance policies is governed by state law. *New York v. Blank,* 27 F.3d 783, 788 (2d Cir.1994). The insurers argue that New York law applies to this action while EDO insists that Connecticut law applies. The insurers also suggest, however, that the court need not decide the choice of law question for the purposes of the present motion, which is limited in scope to the question of the proper interpretation and application of the pollution exclusions, because New York and Connecticut law governing the interpretation of insurance contracts is identical. The court agrees.

In *Olin Corp. v. Insurance Co. of N.A.,* Judge Sand was called upon to interpret a pollution exclusion clause with an exception for "sudden and accidental" discharges. There, as here, the insurers and insured argued for the applicability of New York and Connecticut law respectively. In declining to decide the choice of law question, Judge Sand wrote: "This court finds it unnecessary to determine whether New York or Connecticut has the 'most significant contacts' with the ... insurance policies because we perceive no conflict between the laws of the two states on the dispositive issue in this motion, the meaning of the pollution exclusion clause." *Olin,* 762 F.Supp. 548, 558 (S.D.N.Y.), *partial summary judgment granted,* 771 F.Supp. 76 (1991), *aff'd without op.,* 972 F.2d 1328 (2d Cir.), *aff'd,* 966 F.2d 718 (2d Cir.1992) The court went on to explain:

Two considerations support this conclusion. First, there are no reported Connecticut cases construing a pollution exclusion clause. As such, this Court may presume that Connecticut law is the same as that of New York, especially since the view of the New York court seems to represent the emerging majority view on the interpretation of pollution exclusion clauses. Second, ... the Court finds the language of the pollution exclusion clause to be plain and unambiguous. The rule in Connecticut, as in New York, is that courts are to apply the plain meaning of the words in a

contract provision where the words are clear and unambiguous.

*Id.* (citations omitted). Judge Sand then rejected the same argument EDO offers here—that a Connecticut case, *Verdon v. Transamerica Ins. Co.*, 187 Conn. 363, 446 A.2d 3 (1982), which in construing the word "casualty" found the term "sudden" to be ambiguous, creates a conflict with New York law. *Id.* Finally, Judge Sand concluded that "if the Connecticut Supreme Court were to examine the [pollution exclusion] clause, it would follow the construction adopted by the New York Courts." *Id.*

This court finds Judge Sand's opinion to be well-reasoned and persuasive. Although it remains true that no Connecticut court has construed a "sudden and accidental" exception to a pollution exclusion, in the years since Judge Sand decided *Olin*, the Connecticut Supreme Court interpreted an "absolute" pollution exclusion in *Heyman Assoc. v. Insurance Co. of PA.*, 231 Conn. 756, 653 A.2d 122 (1995). The principles of statutory construction relied upon by Judge Sand are entirely consistent with those set forth by the *Heyman* court, (see *Heyman*, 231 Conn. at 769, 653 A.2d at 129), and with those that would be applicable if New York law were held to govern the interpretation of the pollution exclusions at issue in the instant case. The court also rejects EDO's argument that *Verdon* compels a different conclusion. In short, the court finds it unnecessary at this juncture to decide whether New York or Connecticut law governs the insurers' motions, as the outcome would be the same under either state's law.

**2. Burden of Proof**

█ The insurers maintain that EDO bears the burden of proving the applicability of any exceptions to the pollution exclusions. The court finds that, to the contrary, this burden rests with the insurers.

During the pendency of this case, the Second Circuit decided *New York v. Blank*, in which it addressed the "sudden and accidental" exception to a pollution exclusion clause and stated that "where an exclusion allows for an exception, the insurer bears the burden of showing that the exception to that exclusion does not apply." *Blank*, 27 F.3d at 789 (citing *Colonial Tanning Corp. v. Home Indem. Co.*, 780 F.Supp. 906, 919 (N.D.N.Y. 1991) (placing the burden on the insurer to show that discharge was not "sudden and accidental")). It is thus the law of this Circuit that the insurers bear the burden of demonstrating that the "discharge" at issue was not "sudden and accidental" or "sudden, unintended and unexpected." Although the court has not been able to locate any Connecticut law on this point, neither has it found any reason to conclude that Connecticut law concerning the burden of proving an exception to an exclusion would differ from that of New York. The court therefore finds that the Connecticut Supreme Court would, as did the courts in *Blank* and *Colonial Tanning*, place upon the insurers the burden of proving the inapplicability of an exception to an exclusion.

**B. "Sudden and Accidental"**

█ The court now turns to address those insurance policies that contain the "sudden and accidental" exception to the pollution exclusion clause. The policies containing this language provide:

> This insurance does not apply: ... (f) to bodily injury or property damage arising out of the discharge, dispersal, release or escape of smoke, vapors, soot, fumes, acids, alkalies, toxic chemicals, liquids or gases, waste materials or other irritants, contaminants or pollutants into or upon land, the atmosphere or any watercourse or body of water, but this exclusion does not apply if such discharge, dispersal, release or escape is sudden and accidental.

(*See, e.g.*, Andrako Aff. ¶ 10 [doc. # 231].) The focus of the court's interpretative inquiry is the phrase "sudden and accidental."[3]

---

**3.** EDO invites the court to evade the issue of the meaning of "sudden and accidental" by holding that TCE is not an "irritant," "contaminant" or "pollutant," and therefore that the discharge at issue in this case does not come within the ambit of the pollution exclusion clause. The court declines EDO's invitation, finding that TCE is an irritant, pollutant or contaminant within the meaning of the policy. *See Smith v. Hughes Aircraft Co.*, 10 F.3d 1448, 1453 (9th Cir.1993)

Although it is undisputed that to be covered the discharge at issue must have been *both* sudden *and* accidental, *see, e.g., Technicon Elec. Corp. v. American Home Assur. Co.,* 74 N.Y.2d 66, 67, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989), the parties have debated with particular fervor the meaning of the word "sudden." The insurers argue that "sudden" has a temporal connotation; that is, for an event to be sudden it must occur abruptly. The practical implication of this interpretation is that if the discharge of TCE occurred gradually, as the insurers contend, then the pollution would not be covered under the policies. EDO argues that, in the context of the pollution exclusion and considered in conjunction with "accidental," "sudden" means "unexpected" and has no temporal component. Thus, in EDO's view, a discharge of TCE that occurred gradually and over a period of time but without notice would qualify as "sudden" within the meaning of the exception to the pollution exclusion. As discussed more fully below, the court finds that "sudden" has a temporal connotation and therefore only releases of pollutants that occur over a brief period of time, if they are also "accidental," are covered under the policies.

The court is mindful of the governing principles of contract interpretation. "[C]onstruction of a contract of insurance presents a question of law for the court." *Aetna Life & Cas. Co. v. Bulaong,* 218 Conn. 51, 58, 588 A.2d 138 (1991). When construing an insurance contract, a court must first look to the language of the policy itself for evidence of the parties' intent. *See Schultz v. Hartford Fire Ins. Co.,* 213 Conn. 696, 701, 569 A.2d 1131 (1990). Where the language is clear and unambiguous, the court must enforce the contract as written. *See Hammer v. Lumberman's Mut. Cas. Co.,* 214 Conn. 573, 591, 573 A.2d 699 (1990) (citation omitted). The court must give the words of the policy "their common, ordinary and customary meaning." *Saint Paul Fire & Marine Ins. Co. v. Shernow,* 22 Conn.App. 377, 381, 577 A.2d 1093 (1990) (citing *Gottesman v. Aetna Ins. Co.,* 177 Conn. 631, 634, 418 A.2d 944 (1979)). " 'A court will not torture words to import

ambiguity where the ordinary meaning leaves no room for ambiguity.' " *Hammer,* 214 Conn. at 584, 573 A.2d 699 (quoting *Downs v. National Cas. Co.,* 146 Conn. 490, 494–95, 152 A.2d 316 (1959)).

It is also settled law that " 'exclusions from insurance policy coverage are given strict constructions.' " *Blank,* 27 F.3d at 788 (citation omitted). The insurers carry a heavy burden, "especially ... when the insurer is seeking to avoid the duty to defend." *Id.* at 789. The exclusion must be unmistakably clear and subject to no other reasonable interpretation than that coverage is eliminated. *See id.* at 788–89. Any ambiguities must be construed against the insurer. *Heyman,* 231 Conn. at 769, 653 A.2d at 129.

Finally, " '[e]very provision of the contract must be given effect if it can reasonably be done,' " *Larson Co. v. Lawlor Ins. Agency, Inc.,* 153 Conn. 618, 621–22, 220 A.2d 32 (1966) (quoting *Connecticut Co. v. Division 425,* 147 Conn. 608, 617, 164 A.2d 413 (1960)), and " 'no word or clause is to be eliminated as meaningless, or disregarded as inoperative, if any reasonable meaning consistent with the other parts of the policy can be given to it.' " *Id.* at 622, 164 A.2d 413 (quoting *Downs v. National Cas. Co.,* 146 Conn. 490, 495, 152 A.2d 316 (1959)); *see also Schultz v. Hartford Fire Ins. Co.,* 213 Conn. 696, 706, 569 A.2d 1131 (1990).

The insurers maintain that the word "sudden" is unambiguous, a position that the court finds disingenuous. While a word should not be deemed ambiguous as a matter of law simply because the parties urge conflicting interpretations, *Hammer,* 214 Conn. at 584, 573 A.2d 699 (citation omitted), the court is nonetheless convinced that differing dictionary definitions and divergent judicial opinions on the meaning of "sudden" is a compelling indication that "sudden," standing alone, is a word susceptible of different, reasonable interpretations. *See Heyman,* 231 Conn. at 769, 653 A.2d at 129 (citations omitted) (stating that contract language is ambiguous when it is susceptible of differing, equally reasonable interpretations).

(finding that TCE constitutes an "irritant" within the meaning of the identical policy language);

*see also Heyman,* 231 Conn. at 771, 653 A.2d at 131.

■ The insurers do, however, make a convincing argument that when "sudden" is considered in conjunction with "accidental" it is subject to only one reasonable interpretation: an interpretation that affords "sudden" a temporal connotation. Thus, although a word standing alone can express various shades of meaning, the particular meaning contracting parties intend their words to convey is to be determined not in the abstract but by examining the words in context. *See Shell Oil v. Winterthur Swiss Ins. Co.,* 12 Cal.App.4th 715, 737, 15 Cal.Rptr.2d 815 (1993) (" 'A word generally has several meanings, even in the dictionary. You have to consider the sentence in which it stands to decide which of those meanings it bears in the particular case, and very likely will see that it there has a shade of significance more refined than any given in the wordbook.' ") (quoting Oliver W. Holmes, Jr., *The Theory of Legal Interpretation,* 12 Harv.L.Rev. 417 (1899)).

When "sudden" is read in conjunction with "accidental" and considered in the context of the exception to the policies' pollution exclusions, it becomes clear that "sudden" 's temporal connotation controls. In this context, "sudden" is the opposite of gradual. *See, e.g., ACL Technologies, Inc. v. Northbrook Property and Cas. Ins. Co.,* 17 Cal.App.4th 1773, 1788, 22 Cal.Rptr.2d 206 (1993) (observing that "whatever 'sudden' means, it does not mean gradual. The ordinary person would never think that something which happens gradually also happened suddenly.").

The insurers also argue persuasively that if sudden were not accorded a temporal meaning, that is, if it were deemed to mean only "unexpected," then the word "accidental" would in essence be rendered superfluous. It is clear that for coverage to be restored the "discharge, dispersal, release or escape" must have been both "sudden" and "accidental"—these are two independent requirements that must be satisfied. *See, e.g., Technicon,* 74 N.Y.2d at 75, 544 N.Y.S.2d 531, 542 N.E.2d 1048. Thus, because the discharge must be "sudden" *and* "accidental," "sudden" must have a meaning that is distinct from that of "accidental." If "sudden" meant "unexpected" it would converge with "accidental" which also connotes "unexpected." As New York's Appellate Division, Third Department, wrote in *Borg–Warner Corp. v. Insurance Co. of N.A.:*

> By acknowledging that 'sudden' and 'accidental' are independent requirements, the court necessarily rejected the argument urged by plaintiff here that 'sudden' simply means 'unexpected' and is therefore synonymous with accidental. Only by allowing 'sudden' to retain its temporal aspect does the term attain independent significance. Thus, for a release or discharge to be 'sudden' within the meaning of the pollution exclusion, it must occur abruptly or quickly or over a 'short period of time.'

*Borg–Warner,* 174 A.D.2d 24, 577 N.Y.S.2d 953, 957 (citation omitted), *appeal denied,* 80 N.Y.2d 753, 587 N.Y.S.2d 905, 600 N.E.2d 632 (1992). Not only is this reasoning logical, it accords with the principle of contract construction that courts must make every effort to ensure that each word in a contract is given meaning. *See Larson,* 153 Conn. at 622, 220 A.2d 32. *See also Lower Paxton Township v. United States Fidelity & Guar. Co.,* 383 Pa.Super. 558, 557 A.2d 393, 402 ("The very use of the words 'sudden *and* accidental' reveal[s] a clear intent to define the words differently, stating two separate requirements. Reading 'sudden' in its context, i.e. joined by the word 'and' to the word 'accident', the inescapable conclusion is that 'sudden,' even if including the concept of expectedness is already expressed by 'accident.' "), *appeal denied,* 523 Pa. 649, 567 A.2d 653 (1989).

No federal or state court in Connecticut has construed the term "sudden" in the context of a "sudden and accidental" exception to a pollution exclusion such as the court confronts here. Myriad other courts throughout the country, however, have construed the phrase, because the "sudden and accidental" language was standard in CGL policies from approximately 1970 through 1986 and has generated an enormous amount of litigation. Indeed, because courts are continually interpreting the phrase, it would be virtually impossible to gauge with precision whether more courts have found "sudden" to be ambiguous or unambiguous, or have found

it to mean "abrupt" rather than "unexpected." It is clear, however, that most of the state and federal courts in New York to have considered this question have accorded "sudden" a temporal meaning. *See, e.g., New York v. AMRO Realty Corp.,* 936 F.2d 1420, 1428 (2d Cir.1991); *Ogden Corp. v. Travelers Indem. Co.,* 924 F.2d 39, 42 (2d Cir.1991); *Paxar Corp. v. Lumbermen's Mut. Cas. Co.,* No. 90 Civ. 8059(KTD), 1993 WL 126705, at *3 (S.D.N.Y. Apr. 19, 1993); *G. Heileman Brewing Co. v. Royal Group, Inc.,* 779 F.Supp. 736, 740 (S.D.N.Y.1991), *aff'd,* 969 F.2d 1042 (2d Cir.1992); *Olin,* 762 F.Supp. at 560–61; *EAD Metallurgical, Inc. v. Aetna Cas. & Sur. Co.,* 701 F.Supp. 399, 402 (W.D.N.Y.1988), *aff'd,* 905 F.2d 8 (2d Cir. 1990); *County of Fulton v. USF & G,* 195 A.D.2d 864, 600 N.Y.S.2d 972, 974 (1993); *Borg-Warner,* 577 N.Y.S.2d at 957; *Technicon Elec. Corp. v. American Home Assur. Co.,* 141 A.D.2d 124, 533 N.Y.S.2d 91, 97–98 (1988), *aff'd,* 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989). Absent Connecticut law interpreting "sudden" in the relevant context, the court finds these cases to be particularly persuasive. In addition, having reviewed numerous cases from jurisdictions that took alternative interpretive paths, (that is, found "sudden" to be ambiguous or to mean "unexpected"), the court finds that the cases that give "sudden" a temporal meaning are the better-reasoned.

■ In sum, the court finds that the word "sudden," when considered in conjunction with the term "accidental" and in the context of the pollution exclusion and each policy as a whole, is unambiguous. Newark and Aetna have met the burden of establishing that, in the context of the "sudden and accidental" exception to the pollution exclusion, the word "sudden" means "abrupt" as a matter of law. Because the court finds that it can ascertain the meaning of "sudden" from the text of the policies, it need not—indeed must not—look beyond that text.[4] The court therefore may not consider the drafting history of the pollution exclusion clause or any other extrinsic evidence EDO proffers. *See Heyman,* 231 Conn. at 780, 653 A.2d at 135 ("Because we hold that the ... pollution exclusions are unambiguous ... the parol evidence rule bars the introduction of any extrinsic evidence to vary or contradict the plain meaning ... of the [disputed] term ... as it is used in those exclusions.").

### C. "Sudden, Unintended and Unexpected"

■ Burnhope issued excess policies to EDO for the policy years from 1972 through 1980 and American issued excess policies to EDO from 1978 through 1980. Each of these policies provided that the insurance does not extend to liability for:

> (1) [D]amage to ... property directly or indirectly caused by seepage, pollution or contamination, provided always that this Paragraph (1) shall not apply to liability for damage to property ... where such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this insurance.

(American's Mem. at 8 [doc. # 203]; Burnhope's Mem. at 13 [doc. # 205].)

The court finds that "sudden" as used in this exception to the pollution exclusion, as in the "sudden and accidental" exception discussed above, has a temporal meaning. That is, in order to qualify as sudden, the TCE contamination at issue here must have been the result of an abrupt, as well as "unintended" and "unexpected" "happening" during the policy period. The logic of giving "sudden" a temporal interpretation is even more evident in the context of the American and Burnhope exceptions to the pollution exclusion. If "sudden" meant "unexpected," as EDO would have it, then the American and Burnhope policies would read, "unexpected, unintended, and unexpected." Such a reading would render the word "sudden" superfluous and, as the court has already discussed, it will not subscribe to such an inter-

---

4. Neither does the court find persuasive EDO's argument that Aetna's 1985 primary insurance policy, which contains the "sudden and accidental" language, should be treated differently from Aetna's other policies containing the same language because Aetna added a $100,000 deductible to that policy for pollution coverage. (*See* Tr.Oral Argument at 54; Berringer Supp.Aff.Ex. 29.)

pretation. *See, e.g., Olin,* 762 F.Supp. at 563–64.

The court therefore finds that American and Burnhope have met the burden of establishing that "sudden" is unambiguous in the context of the "sudden, unintended and unexpected" exceptions to their policies' pollution exclusions, and that "sudden" in that context means "abrupt."

### D. *The Discharge of TCE was not "Sudden"*

■ The court now turns to consider whether, based on the undisputed facts and drawing all inferences in favor of EDO, the release of TCE here at issue was "sudden" as the court has defined that term. The court finds that the insurers have met the burden of establishing that the exceptions to the pollution exclusions were not triggered because the release of TCE was not "sudden."

Although the present record contains considerable evidence of TCE contamination, it contains comparatively little evidence concerning the genesis of that contamination. What evidence exists supports one conclusion: the releases of TCE at the ELINCO facility were the result of leaks and/or spills that occurred during the ordinary course of business. There is no evidence of any identifiable, abrupt occurrence resulting in TCE contamination.[5] Rather, the discharges or releases of TCE are consistently described as the result of "leaks" from or "spills" around EDO's storage tanks and drums.[6] (*See, e.g.,* Joyce Aff.Ex. 5 (HRP concluded that "some leakage and spillage [of chlorinated solvents] has occurred over time" at the ELINCO facility and observed that the pavement adjacent to the location where waste was stored in drums is soft, which would be consistent with "prolonged leakage or spillage"); *id.* Ex. 6 (letter from CDEP to President of EDO/ELINCO noting that "drum storage of [trichloroethylene] . . . on the ground surface is the likely source of the soil contamination" at ELINCO site); *id.* Ex. 8 (CDEP Abatement Order requiring investigation of "groundwater, surface water and soil contamination resulting from chemical storage, handling and disposal activities" at ELINCO site); *id.* Ex. 16 (letter from EDO's corporate counsel referring to

---

**5.** The court emphasizes that it is the "discharge, dispersal, release or escape" of pollutants that must occur over a brief period of time in order to be "sudden." The present record contains no evidence of any abrupt event triggering the TCE releases. Nor does the record contain any evidence to suggest that the releases of TCE occurred over a brief period of time. *Compare EAD Metallurgical,* 701 F.Supp. 399, 402 (W.D.N.Y.1988) (discussing *Allstate Ins. Co. v. Klock Oil Co.,* 73 A.D.2d 486, 426 N.Y.S.2d 603 (1980), and explaining that that court found that "where the original release may be seen as one brief event although the subsequent spread of the contaminant is gradual, the discharge may still be deemed sudden."); *Borg–Warner,* 577 N.Y.S.2d at 958 (discussing two New York cases in which "this court held that it could not exclude the possibility that the crack that had precipitated the leak had been abrupt, but had remained undetected for a lengthy period of time"); *Lumbermens Mut. Cas. Co. v. Belleville Indus., Inc.,* 407 Mass. 675, 555 N.E.2d 568, 681 (1990) ("Surely, the abruptness of the commencement of the release or discharge of the pollutant is the crucial element."); *Shell Oil,* 12 Cal.App.4th at 737, 15 Cal.Rptr.2d 815 (" 'Sudden' events start abruptly"); *G. Heileman,* 779 F.Supp. at 740 (discussing Michigan law and finding that in applying the "sudden and acci-

dental" exception the "[c]ourt is to focus on the initial discharge of waste into the environment").

**6.** In a footnote to its memorandum, EDO suggests that at some unspecified point in time during the 1970s, "a 55 gallon steel drum containing TCE was accidentally damaged, allowing TCE to spill onto a asphalt parking lot at the ELINCO facility." (EDO's Mem. at 6 n. 4 [doc. # 234].) There is no evidence in the record, however, to suggest that this incident could have contributed to the contamination of KDWF. Indeed, the evidence is to the contrary. (Joyce Aff.Ex. 4 (Lender Depo. at 441–46) (describing this spill as having occurred in a location removed from the drum storage area where the TCE contamination was found, and explaining that the TCE "didn't penetrate" and that "we have concluded that there was no major damage there.")). Moreover, Harold Brueniger, EDO's broker, testified at a deposition that no one from EDO "ever told [him] about any kind of a specific spill at the ELINCO Norwalk site." (Joyce Aff.Ex. 19.) In addition, a letter written by counsel for EDO, Donald W. Stever, to Aetna in January of 1988, states that "[t]o the extent there is evidence of spillage, it indicates that spillage from drums occurred either as a result of accidental damage to them in the yard or as a result of rainfall causing overtopping of drums left uncovered by persons unknown, possibly EDO employees." (*Id.* at Ex. 28.)

CDEP's discovery "that several storage drums were leaking"); *id.* Ex. 25 (President of EDO/ELINCO averring that "[i]t is possible that spillage could have occurred during placement of or removal of barrels of spent solvent from drum storage area"); *id.* Ex. 31 (CDEP's Finding in Support of Abatement Order noting "serious problems with the trichloroethylene drum storage in rear of building with evidence of leakage and/or spillage.... Also evidence of spillage and/or leakage at bulk storage tank for trichloroethylene at back of building.")).

Case law instructs that releases of pollutants, occurring not as the result of a sudden event but either as a matter of course in the daily operation of the plant or as the result of a slowly occurring event, such as might be the case with a leak caused by corrosion, are not "sudden" events within the meaning of the "sudden and accidental" or "sudden, unintended and unexpected" exceptions to the pollution exclusions. *See, e.g., AMRO Realty Corp.,* 936 F.2d at 1428 ("The underlying complaint here, alleging that an industrial operation disposed of its manufacturing waste ... for close to thirty years, cannot be understood to allege a 'sudden release'."); *Ogden,* 924 F.2d at 42 (allegations of "continuous discharge of pollutants" over a thirty-three year period are not sudden); *Hartford Acc. & Indem. Co. v. USF & G,* 962 F.2d 1484, 1489 (10th Cir.1992) (" 'sudden' cannot mean 'gradual' 'routine' or 'continuous' "); *Great Lakes Container v. National Union Fire Ins.,* 727 F.2d 30, 33–34 (1st Cir.1984) (finding no "sudden" releases where groundwater was contaminated by migration of wastes discharged in regular operation of business); *Industrial Indem. Ins. v. Crown Auto Dealerships, Inc.,* 731 F.Supp. 1517, 1521 (M.D.Fla.1990) (finding that spills and leaks were "commonplace events which occurred in the course of daily business, and therefore cannot, as a matter of law, be classified as 'sudden and accidental' "); *American Mut. Liab. Ins. v. Neville Chem.,* 650 F.Supp. 929, 933 (W.D.Pa.1987) (finding that "contamination ... by annual careless spillage onto the ground surface cannot be

sudden, or unexpected and accidental"); *Liberty Mut. Ins. Co. v. SCA Serv., Inc.,* 412 Mass. 330, 588 N.E.2d 1346 (1992) (finding allegations of "routine business activity lasting over several months" were not subject to the "sudden and accidental" exception to the pollution exclusion); *Waste Management v. Peerless Ins. Co.,* 315 N.C. 688, 340 S.E.2d 374, 383 (1986) (no coverage where contaminants had not suddenly leached into groundwater); *Techalloy Co. v. Reliance Ins. Co.,* 338 Pa.Super. 1, 487 A.2d 820, 827 (1984) (no allegation of sudden event where contamination was alleged to have occurred on a "regular or sporadic basis from time to time during the past 25 years"); *Shell Oil,* 12 Cal. App.4th at 754, 15 Cal.Rptr.2d 815 ("We cannot reasonably call 'sudden' a process that occurs slowly and incrementally over a relatively long time.").

Simply put, the undisputed facts establish that the TCE contamination was the result of numerous leaks and spills that occurred in the regular operation of the ELINCO facility over the course of many years. Because the court finds that the escape of TCE was not "sudden," it does not address the question of whether it was also "accidental" within the meaning of the exceptions to the pollution exclusions. *See Ogden,* 924 F.2d at 42.

The court therefore finds that the insurers have met their burden of establishing that, as a matter of law, the TCE contamination falls within the policies' pollution exclusions.[7] EDO, by contrast, has failed to meet its burden as the nonmovant of contradicting the evidence proffered by the insurers and raising disputed issues of material fact for trial. *See A. Johnson & Co. v. Aetna Cas. & Sur. Co.,* 933 F.2d 66, 75 (1st Cir.1991) (speculation that individual leaks occurred suddenly is insufficient to contradict evidence of a pattern of non-sudden occurrences). The absence of evidence to support EDO's position that the TCE discharges were, or could have been, "sudden," does not preclude the court from making findings as to the undisputed facts or from making a determination as a matter of law. Discovery in this case has

---

**7.** The court reiterates that this Ruling holds only that the undisputed facts demonstrate that the TCE contamination was not the result of a "sud-

den" event. The court must still decide whether the insurers had a duty to defend and/or indemnify EDO.

been conducted and "a party opposing a motion for summary judgment is not entitled to rely upon the hope of a subsequent magical appearance at trial of genuine issues of material fact." *United States Steel Corp. v. United States,* 305 F.Supp. 497, 503 (S.D.N.Y. 1969).

### E. The "Absolute" Pollution Exclusion

 Aetna's insurance policies issued to EDO for the 1986 policy year contain "absolute" pollution exclusions. These policies provide, in pertinent part, that the insurance does not apply

> 1. To *Bodily Injury* or *Property Damage* arising out of the actual, alleged or threatened discharge, dispersal, release, escape or contamination by pollutants:
>
> A. At or from the premises owned by, rented to, or occupied by the insured; ...
>
> 2. Any loss, cost or expense arising out of any governmental direction or request imposed upon the Insured to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize pollutants, or for the preparation of any plan relating to any of the foregoing activities.

(*See* Velez Aff.Ex. F, J) (emphasis in original). The court finds that these provisions unambiguously exclude coverage for liability arising from the pollution at issue here.

The sole question for the court is whether the contamination of the KDWF resulted from the discharge or release of pollutants. The Connecticut Supreme Court recently interpreted the term "pollutant" in the context of an "absolute" pollution exclusion. *See Heyman,* 231 Conn. at 771, 653 A.2d at 131. The *Heyman* court found that fuel oil in a waterway is a pollutant, as it "corrupts" or "infects" the affected water. *Id.* This court, therefore, easily concludes that the presence of TCE in the KDWF corrupted that water supply and that TCE is a pollutant within the meaning of Aetna's 1986 policies. *See also supra* note 3.

### CONCLUSION

Based on the foregoing, the court finds that the word "sudden" in the policies containing the "sudden and accidental" exception to the pollution exclusion and in the policies containing the "sudden, unexpected and unintended" exception to the pollution exclusion has a temporal connotation denoting an event that occurs abruptly. The court also finds that the release of TCE here at issue did not occur suddenly. Finally, the court finds that the "absolute" pollution exclusions preclude coverage for all EDO's pollution related expenses.

SO ORDERED.