**EDO CORPORATION**

v.

**NEWARK INS. CO., et al.**

**Civ. No. H–90–951(AHN).**

United States District Court,
D. Connecticut.

Aug. 22, 1995.

John B. Berringer, Steven J. Dolmanisth, Anderson, Kill, Olick & Oshinsky, PC, New York City, John Colleran, Colleran & Carboni, PC, New Haven, CT, for plaintiff.

Louis B. Blumenfeld, Cooney, Scully & Dowling, Hartford, CT, Robert L. Joyce, Wilson, Elser, Moskowit, Edelman & Dicker, New York City, Bruce M. Engel, Blatt, Hammesfahr & Eaton, Daniel G. Joran, Caron & Fitzgerald, Chicago, IL, John S. Papa, Howard, Kohn, Sprague & Fitzgerald, Hartford, CT, for defendants.

## RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

NEVAS, District Judge.

Plaintiff EDO Corporation ("EDO") commenced this declaratory judgment action against its primary insurers, Newark Insurance Co. ("Newark") and Aetna Insurance Company ("Aetna"), and against excess insurers, Burnhope and Companies ("Burnhope") and American Insurance Company ("American") (collectively, "the insurers"), seeking a declaration that it is entitled to insurance coverage for expenditures it incurred in connection with environmental contamination.

Familiarity with the court's previous ruling interpreting and applying the insurance policies' pollution exclusion clauses is presumed. *See EDO Corp. v. Newark Ins. Co.*, 878 F.Supp. 366 (D.Conn.1995). Currently before the court are four motions for summary judgment. Each insurer seeks a determination that its policies' pollution exclusion clauses absolve it of its duty to defend and/or indemnify EDO for the clean-up costs EDO incurred.[1]

For the reasons that follow, the court finds that Newark and Aetna breached their respective duties to defend EDO but that none of the insurers breached its duty to indemnify EDO. Accordingly, Newark's motion for summary judgment [doc. # 202] is GRANTED as to the duty to indemnify, but DENIED as to the duty to defend. Aetna's motion for summary judgment [doc. # 204] is GRANTED as to the duty to indemnify, and DENIED as to the duty to defend, except as to the 1986 policy containing the absolute pollution exclusion clause, with respect to which Aetna's motion is GRANTED. American's motion for summary judgment [doc. # 225] and Burnhope's motion for summary judgment [doc. # 226], both of which implicate only the duty to indemnify, are GRANTED.

## STANDARD

In a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to

---

1. Aetna's and Newark's policies impose both defense and indemnification duties. American's and Burnhope's policies impose indemnification duties only. The final determination of whether Newark and Aetna owe EDO the duty to defend turns upon several issues which were raised in the motions for summary judgment originally filed with the court. [docs. ## 183, 188, 191]. Those motions have been denied without prejudice to renewal. At this time, the sole issue before the court is the effect of the policies' "pollution exclusion" clauses on the insurers' duties to defend and/or indemnify EDO.

judgment as a matter of law. Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986). A court must grant summary judgment " 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact.' " *Miner v. City of Glens Falls,* 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). "A dispute regarding a material fact is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Aldrich v. Randolph Cent. Sch. Dist.,* 963 F.2d 520, 523 (2d Cir.) (quoting *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510), *cert. denied,* —— U.S. ——, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). After discovery, if the nonmoving party "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The court resolves "all ambiguities and draw[s] all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich,* 963 F.2d at 523. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci,* 923 F.2d 979, 982 (2d Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991). *See also Suburban Propane v. Proctor Gas, Inc.,* 953 F.2d 780, 788 (2d Cir.1992).

### *FINDINGS OF FACT*

The court finds the following facts to be undisputed.[2]

Newark issued ten successive primary Comprehensive General Liability ("CGL") policies to EDO, which together cover the period from December 31, 1972 through December 31, 1982. (*See* Andrako Aff. ¶ 3 [doc. # 231].) These policies provide insurance coverage for "all sums which the insured shall become legally obligated to pay as dam-

ages because of bodily injury or property damage to which this insurance applies, caused by an occurrence." (*Id.* ¶ 11.) In addition, the Newark policies provide that "the company shall have the right and duty to defend any suit against the insured ... and may make such investigation and settlement of any claim or suit as it deems expedient." (*Id.* ¶ 9.)

Each of Newark's policies also contains a pollution exclusion clause that excludes coverage for "bodily injury or property damage arising out of the discharge, dispersal, release or escape ... of pollutants" unless such "discharge, dispersal, release or escape is sudden and accidental." (*Id.* ¶ 10.)

Aetna issued CGL and/or excess policies to EDO for the policy years of December 31, 1980–1981; December 31, 1982–December 31, 1983; December 31, 1983–December 31, 1984; and December 31, 1984–December 31, 1985. (*See* Velez Aff. Exs. A–E, G–I [doc. # 196].) These Aetna policies contain indemnification language similar to that of Newark's policies, as well as the identical pollution exclusion clause with the exception for "sudden and accidental" discharges. (*See id.*) Aetna's CGL policies also contain the duty to defend. (*See id.* Exs. G–J.)

For the policy year of December 31, 1985–December 31, 1986, however, Aetna issued to EDO excess and CGL policies containing absolute pollution exclusion clauses. (*See id.* Exs. F, J ("the 1986 policies").) The 1986 policies exclude coverage for "bodily injury or property damage arising out of the actual, alleged or threatened discharge, dispersal, release, escape or contamination by pollutants." (*Id.*)

American issued to EDO three excess policies providing EDO with coverage from January 1, 1978 through January 1, 1980. (Jordan Aff.Exs. A–C [doc. # 208].) Burnhope issued excess policies to EDO between 1974 and 1980. (Whiting Aff.Exs. 1, 2 [doc. # 206].) These excess policies confer upon the insurers the duty to indemnify EDO, (*see, e.g.,* Jordan Aff. ¶ 3), but exclude cover-

---

**2.** The court sets forth only those findings of fact that are relevant to resolving the particular legal questions at issue.

age for personal injury or property damage "caused by seepage, pollution or contamination" unless "such seepage, pollution or contamination is caused by a sudden, unintended and unexpected happening during the period of this Insurance." (*See, e.g.,* Jordan Aff. ¶ 7.)

In July of 1986, the Environmental Protection Agency ("EPA"), issued a letter to EDO, naming EDO a "potentially responsible party" for the contamination at the Kellogg–Deering Well Field ("KDWF") in Norwalk, Connecticut. (*See* Berringer Aff.Ex.L. [doc. # 185] ("PRP letter" or "the Letter").)

In May of 1990, EDO received a Special Notice letter from the EPA demanding that EDO conduct the remediation of the Superfund Site, and reimburse the EPA for the costs associated with the investigation of that Site. (*See id.* Aff.Ex. O ("Special Notice letter").)

On February 12, 1991, the EPA filed a complaint against EDO and others seeking to recover costs incurred in responding to the releases of hazardous substances detected at the KDWF. (*See id.* Ex. Q.) On the same day, EDO and the EPA lodged a proposed Consent Decree, or settlement.[3] The court approved the settlement and Consent Decree on November 25, 1992. (*See id.* Ex. P.)

### DISCUSSION

The CGL policies issued by Aetna and Newark obligate them "to defend any suit" brought against EDO. Each of these policies also requires Aetna and Newark to indemnify EDO for any liability incurred, as long as the underlying claims fall within the scope of the policies' coverage. The American and Burnhope excess policies, by contrast, impose upon the insurers the duty to indemnify only.

The duty to defend and the duty to indemnify are governed by different standards and will be discussed separately below. Before turning to that discussion, however, the court notes that there is an outstanding choice of

law question: the insurers argue for the application of New York law while EDO argues for the application of Connecticut law. The court finds that it may again defer decision on the choice of law, as the disposition of each of the issues presented would be the same under either state's law.

### I. Aetna's and Newark's Duty to Defend

Aetna's and Newark's CGL policies provide: "[T]he company shall have the right and duty to defend any suit against the insured ... and may make such investigation and settlement of any claim or suit as it deems expedient." (Andrako Aff. ¶ 9; Velez Aff. Exs. G–J.) Accordingly, to trigger the duty to defend, the EPA's claim against EDO must constitute a "suit." In addition, for the duty to defend to be triggered, the allegations made in the underlying claim must fall within the coverage provided by the policies. *See, e.g., Alderman v. Hanover Ins. Group,* 169 Conn. 603, 610, 363 A.2d 1102 (1975) (quoting *Lee v. Aetna Cas. & Sur. Co.,* 178 F.2d 750, 751 (2d Cir.1949)) ("The duty to defend means 'that the insurer will defend the suit, if the injured party states a claim, which, qua claim, is for an injury 'covered' by the policy; it is the claim which determines the insurer's duty to defend.' "). For the duty to defend to be triggered in this case, the allegations of the underlying claim must fall outside of the policies' pollution exclusion clauses.

The parties dispute whether these two preconditions to the triggering of the duty to defend occurred. That is, the parties dispute (1) whether the EPA brought a "suit" against EDO within the meaning of the policies, and (2) whether, if there was a "suit," the allegations of the claim contained in the "suit" fall within coverage for the purpose of triggering the duty to defend. The court will address each issue in turn.

### A. The PRP Letter was a "Suit" Sufficient to Trigger the Duty to Defend

█ The parties disagree about the meaning of the term "suit" and about whether any

---

**3.** The formal complaint against EDO was not filed until *after* the EPA and EDO entered into a settlement. (*See* Newark's & Aetna's Mem.Supp. Summ.J. at 10 [doc. # 247]; Berringer Aff.Ex.P.)

To the extent that the court's ruling of February 15, 1995 found otherwise, *see EDO,* 878 F.Supp. at 370, the record on that point is hereby corrected.

of the documents sent by the EPA to EDO constitutes a "suit."

Aetna and Newark argue for a narrow definition of "suit," precluding all but "proceeding[s] in a court of law." (Newark's & Aetna's Mem. at 3 [doc. #247].) In their view, there never was a "suit" within the meaning of the policies.[4] EDO, however, argues for an interpretation of "suit" that would encompass administrative proceedings brought pursuant to the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (CERCLA). Accordingly, EDO takes the position that the PRP letter of July, 1986, issued by the EPA under the authority of CERCLA, commenced a "suit." Alternatively, EDO argues that either the May, 1990 Special Notice letter or the complaint filed with the proposed consent decree in February of 1991, constitutes a "suit."

The term "suit" is not defined by the subject policies. When construing the terms of an insurance policy, the court must give the words "their common, ordinary and customary meaning." *Saint Paul Fire & Marine Ins. Co. v. Shernow*, 22 Conn.App. 377, 382, 577 A.2d 1093 (1990) (citing *Gottesman v. Aetna Ins. Co.*, 177 Conn. 631, 634, 418 A.2d 944 (1979)). If a word may reasonably be said to have more than one meaning, "the construction most favorable to the insured is to be adopted." *Raffel v. Travelers Indem. Co.*, 141 Conn. 389, 392, 106 A.2d 716 (1954); *see United States Fidelity & Guar. Co. v. Annunziata*, 67 N.Y.2d 229, 501 N.Y.S.2d 790, 791, 492 N.E.2d 1206, 1207 (1986) (New York law). *See also Village of Morrisville Water & Light Dep't v. United States Fidelity & Guar. Co.*, 775 F.Supp. 718, 733 (D.Vt. 1991) ("[T]he fact that another reasonable interpretation of the term 'suit' exists simply creates an ambiguity.... [A]ny ambiguity must be strictly construed in favor of [the insured].").

Some courts faced with interpreting the term "suit" in CGL policies such as confront the court here, have taken the position that only a formal judicial proceeding qualifies as a "suit." *See, e.g., Linemaster Switch Corp. v. Aetna Life & Cas. Corp.*, No. CV91–0396432S, 1995 WL 462270, at *14, 1995 Conn.Super. LEXIS 2229, at *39 (Conn.Super. July 31, 1995) (finding that "a 'suit' is an action filed in court to secure damages or injunctive relief"). These courts look to whether an action has been "brought in court by means of writ, summons and complaint" to determine whether there has been a "suit." *Id.*, 1995 WL 462270, at *6, 1995 Conn.Super. LEXIS 2229, at *16. Many other courts, however, have held that "suit" in a CGL policy can encompass certain regulatory actions taken by a governmental agency. *See, e.g., Ryan v. Royal Ins. Co. of Am.*, 916 F.2d 731, 742 (1st Cir.1990) (construing New York law and finding that, although a "suit" need not be a formal judicial proceeding, a letter from the New York Department of Environmental Conservation did not constitute a "suit"); *Avondale Indus., Inc. v. Travelers Indem. Co.*, 887 F.2d 1200, 1206 (2d Cir.1989) (construing New York law and finding demand letter issued by state environmental agency qualifies as "suit" under CGL policy), *cert. denied*, 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1993); *Colonial Tanning Corp. v. Home Indem. Co.*, 780 F.Supp. 906, 915 (N.D.N.Y.1991) (finding that administrative agency's complaint constituted a "suit"); *Morrisville*, 775 F.Supp. 718, 731 (finding that PRP letter constituted a "suit"); *Hazen Paper Co. v. United States Fidelity & Guar. Co.*, 407 Mass. 689, 555 N.E.2d 576, 579 (1990) (finding that PRP letter constituted a "suit"). These courts look to whether certain administrative orders, or letters to the insured from the governmental agency, can be said to constitute a "suit."

In the court's view, the ordinary meaning of the term "suit" contemplates "the process ... of suing in a court of law" as well as the more broadly phrased, but consistent defini-

---

Newark and Aetna request permission to brief the court on "the 'claim' or 'suit' issue." (Newark's & Aetna's Mem.Supp.Summ.J. at 4 n. 4.) The court is perplexed by this request. By order dated February 15, 1995, the court sought supplemental briefing from the parties. The court specifically asked the parties to address the question of what document, if any, triggered the duty to defend. This necessarily includes, as EDO recognized, a discussion of what document, if any, constitutes a "suit," because, under the policies, only a "suit" (not a document) triggers the duty to defend. The request for further supplemental briefing is denied.

tion, "the attempt to gain an end by legal process." *C.D. Spangler Constr. Co. v. Industrial Crankshaft & Eng'g Co.*, 326 N.C. 133, 388 S.E.2d 557, 570 (1990) (quoting *Webster's Third New World International Dictionary* 2286 (1976)). It is true, however, that the word "suit" may reasonably be read either broadly or narrowly. To the extent that "suit" may, for that reason, be deemed ambiguous, the broader, more encompassing reading—that reading "which will sustain the claim and cover the loss"—must be adopted. *Raffel*, 141 Conn. at 392, 106 A.2d 716.

It is the court's duty to ascertain, from the language of the insurance contract alone if possible, what the parties to the contract intended by "suit" when they entered into the contract. It is beyond dispute that, when the parties signed these CGL policies, they contemplated that Aetna and Newark would provide a defense if EDO were sued. Looking to the policy as a whole, the court is convinced that EDO reasonably would have expected to be defended if "legal process" was brought to bear against it, regardless of whether that legal process occurred in a court of law, or in an administrative proceeding, or was signified by a summons and complaint or by an agency order. Put differently, the court is not persuaded that EDO expected a defense only if it was sued in a court of law. To hold that there has only been a "suit" if EDO is sued in a court of law would be to read into the policy an unwarranted limitation, contrary to the reasonable expectations of the insured. *See New York v. Blank*, 27 F.3d 783, 792 (2d Cir.1994) ("In interpreting insurance policies, '[n]arrow and technical legal definitions are to be avoided.'") (citation omitted); *Ryan*, 916 F.2d at 735 ("To argue that the word "suit" is to be accorded talismanic significance brings to the language of the policy a precision that the

drafter omitted and that the parties were not bound to anticipate."); *Ace Wire & Cable Co., Inc. v. Aetna Cas. & Sur. Co.*, 60 N.Y.2d 390, 469 N.Y.S.2d 655, 658, 457 N.E.2d 761, 764 (1983) ("The tests to be applied in construing an insurance policy are common speech ... and the reasonable expectation and purpose of the ordinary business [person].") (citations omitted).

■ The court finds that it is objectively reasonable for EDO to expect that Aetna and Newark's obligation to defend it against "any suit" was not limited to actions brought in a court of law. The court further finds that the highest state courts of both Connecticut and New York[5] would adopt such a broad, nonformalistic construction of "suit" in this context, rather than limit its meaning to formal judicial proceedings instituted by the filing of a complaint.[6]

■ Having found that a "suit" does not require a formal judicial proceeding, the court must determine whether any of the documents EDO has identified—the PRP letter, the Special Notice letter, and the EPA complaint filed in February, 1991—is a "suit." That is, because "suit" contemplates "an attempt to gain an end by legal process," the court is required to decide when such an attempt has been made sufficient to trigger the duty to defend.

Those courts that have interpreted "suit" broadly are generally split concerning what constitutes a "suit." *See Ryan*, 916 F.2d at 738 (noting split and citing cases); *Linemaster*, 1995 WL 462270, at *7–8, 1995 Conn.Super. LEXIS 2229, at *20–21 (same); Barry R. Ostrager & Thomas R. Newman, *Handbook on Insurance Coverage Disputes* 418–23 (6th ed. 1993) (chart illustrating split). Although there is agreement among the cases

---

5. When a federal district court has the task of applying state law and the highest court of that state has not ruled on an issue, the district court must determine how that court would rule. *See Travelers Ins. Co. v. 633 Third Assocs.*, 14 F.3d 114, 119 (2d Cir.1994). In so doing, it may consider decisions from other jurisdictions. *Id.*

6. In February 1991, the EPA filed a complaint—a literal lawsuit—against EDO. EDO argues that if the court rejects its argument that the PRP letter or the Special Notice letter constitutes a

"suit," the court should find that this complaint constitutes a "suit." Aetna and Newark reject even this proposition, arguing that, because it was filed with the proposed consent decree, the complaint served as a mere formality. (*See* Newark's & Aetna's Mem.Supp.Summ.J. at 10–11.) Apparently, even Newark and Aetna think it reasonable to look to the context in which the alleged "suit" is received to assess whether it constitutes a "suit" triggering the duty to defend.

that not every letter, notice, or claim sent to an insurer qualifies as a "suit," there is no clear consensus on what constitutes a "suit" sufficient to trigger the duty to defend.

The cases do, however, provide some guidance. First, in assessing whether there has been a "suit," courts look to the language of the claim itself to determine whether it is adversarial or coercive. The purpose of this inquiry is to assess whether the claim has the "hallmarks of litigation." *Avondale*, 887 F.2d at 1206. Second, courts look to the context in which the claim is made and consider its potential legal consequences. The purpose of this inquiry is to gauge whether the claim is the "functional equivalent" of a "suit" sufficient to trigger the duty to defend. *Ryan*, 916 F.2d at 741. Both of these inquiries are "inherently fact-intensive." *Colonial Tanning*, 780 F.Supp. at 913.

EDO argues that the PRP letter is a "suit" triggering Aetna's and Newark's duty to defend. The court agrees.

As the court in *Linemaster* recently explained:

The PRP letter from a government agency notifies the insured that the state regards the insured as potentially responsible for having contaminated a site. Such letters usually "request" under threat of subsequent legal proceedings that the party provide information as to involvement in the site in question and cooperate in an investigation into the alleged contamination.

*Linemaster*, 1995 WL 462270, at *7, 1995 Conn.Super. LEXIS 2229, at *21 (citation omitted).

The PRP letter in this case is captioned, *"URGENT LEGAL MATTER—PROMPT REPLY NECESSARY."* (Berringer Aff. Ex.L.) It advises EDO that the EPA "has reason to believe that the EDO Corporation through its ELINCO Division was the operator of the facility (as defined by Section 101(9) of CERCLA) located at or nearby 272 Main Avenue in Norwalk, Connecticut." (*Id.*) The Letter states: "The EPA has determined that a release of hazardous substances ... has occurred at the above-mentioned facility. At the present time, trichoroethylene [sic] (TCE), as well as other

chemicals, is contaminating the groundwater aquifer underneath the above mentioned facility." (*Id.*) The EPA warns EDO that it may be designated a responsible party for the contamination of the KDWF and warns EDO that EDO may be obligated, under CERCLA, to pay all the costs incurred in responding to that contamination. (*Id.*) In particular, the Letter "notifies the EDO Corporation of its potential liability with regard to this matter and encourages it to voluntarily undertake cleanup activities which will be overseen by the EPA." (*Id.*)

The PRP letter also alerts EDO that "[u]nless the EPA determines that a responsible party will [take proper corrective action to control the releases of hazardous substances], the EPA intends to do so pursuant to Section 104 [of CERCLA]. (*Id.*) The PRP letter makes clear that EDO may be asked to undertake, or to reimburse the EPA for undertaking, certain additional measures outlined in the Letter.

The PRP letter apprises EDO that the EPA has already spent public funds and is considering spending additional money to investigate and correct releases of hazardous substances at the KDWF. (*Id.*) The Letter also describes two studies, a remedial investigation and a feasibility study, that the EPA had already undertaken. (*Id.*) The PRP letter advises EDO that the feasibility study is available for public comment, that EDO may wish to participate in the public comment period, and that, after comments are received, the EPA will select a remedial alternative for the site. (*See id.*)

Finally, the PRP letter notes that legal questions should be addressed to an EPA attorney whose number is given. In closing, the Letter states: "Due to the seriousness of the problem at this site and the attendant legal ramifications, the EPA strongly encourages your company to submit a written response within the [fourteen day] time frame specified herein. We hope that you will give these matters your immediate attention." (*Id.*)

Considering the language of the Letter as a whole, the court finds that it is sufficiently adversarial to constitute a "suit." The PRP letter notifies EDO that it may be facing

substantial liability under CERCLA. It informs EDO that the EPA has *already* spent funds to investigate the site and plan remedial action. Thus, in light of CERCLA's liability provisions, EDO was in an adversarial position. CERCLA, the statute pursuant to which the PRP letter was sent, makes clear that a potentially responsible party may be liable without regard to fault and has available to it only three defenses; CERCLA essentially imposes strict liability. *See* 42 U.S.C.A. § 9607(b) (West 1983); *Morrisville,* 775 F.Supp. at 733 ("Morrisville had little prospect of avoiding financial responsibility under CERCLA, because liability is not based on fault and the available defenses are very limited.... [T]o protect itself from financial devastation, it was critical for Morrisville to become involved in settlement discussions with the EPA.").

The PRP letter also outlines the limited options EDO may take in response to the Letter. The Letter states that, "[u]nless the EPA determines that a responsible party will properly perform such actions, the EPA intends to do so pursuant to [CERCLA]." The PRP letter notifies EDO of the EPA's intention to use "legal process" to address the contamination of the KDWF and to enforce the provisions of CERCLA against EDO; it thus alerts EDO to the prospect of *"probable and imminent* governmental action" by the EPA. *See Ryan,* 916 F.2d at 738. The Letter's references to an "urgent legal matter," and to "attendant legal ramifications," as well as its "strong[ ] encourage[ment]" that EDO give the matter its "immediate attention," make the urgent, and adversarial, nature of the communication explicit.

Aetna and Newark argue that the Letter is not sufficiently coercive to constitute a "suit" triggering the duty to defend. They make much of the fact that the EPA "encourages [EDO] to voluntarily undertake cleanup activities." They point to *Technicon,* where the New York Appellate Division held that the subject PRP letter did not constitute a "suit" because it "merely informed Technicon of its potential liability under CERCLA and

that the EPA was interested in discussing Technicon's voluntary participation in remedial measures." *Technicon Elec. Corp. v. American Home Assurance Co.,* 141 A.D.2d 124, 533 N.Y.S.2d 91, 105 (1988), *aff'd on other grounds,* 74 N.Y.2d 66, 544 N.Y.S.2d 531, 542 N.E.2d 1048 (1989). The *Technicon* court characterized the PRP letter as "an invitation to voluntary action" and found that it was, therefore, insufficiently adversarial to qualify as a "suit." *Id. See also Avondale,* 887 F.2d at 1206 (finding demand letter constituted a "suit" but distinguishing "[a] request to participate voluntarily in remedial measures" from the more "adversarial posture" of the demand letter). *But see Hazen,* 555 N.E.2d at 580, 581 (finding that although EPA PRP letter sought to "discuss [insured's] voluntary involvement" it constituted a "suit" and adding that "[i]t would be naive to characterize the EPA letter as a request for voluntary action"); *County of Niagara v. Fireman's Fund Ins. Co.,* Vol. 4, No. 17 Mealey's Litigation Reports–Insurance No. 10, C–5 (N.Y.Sup.Ct. Niagara County Mar. 27, 1990) (finding that EPA PRP letter constituted a "suit" and stating that "this Court fails to appreciate the alleged 'voluntariness of the action' sought by the instant PRP letter.").

Aetna's and Newark's focus on the sentence, "[[t]he EPA] encourages [EDO] to voluntarily undertake cleanup activities," is myopic. The words "voluntary" and "encourage" are not representative of the tone of the PRP Letter as a whole.[7] Moreover, Aetna and Newark overlook the rest of the sentence—that part which states that all activity "will be overseen by the EPA." (Berringer Aff.Ex.L.) EPA oversight of EDO's activity significantly diminishes the "voluntary" nature of such activity. *See Hazen,* 555 N.E.2d at 580 (describing PRP letter and noting that " 'the only form of voluntary involvement' that EPA would consider is 'commitment to a complete implementation of all the measures needed' "). In addition, as the court has already noted, EDO could not simply reject this "invitation" and avoid liability—as of the date it received the Letter, it

---

7. The *Technicon* court does not set forth the entire contents of the PRP letter at issue, nor quote from it at all, making it impossible for this court to compare the tone of the *Technicon* letter as a whole, to the tone of the PRP letter in this case.

had, in all likelihood, already incurred substantial financial liability.

The insured's defense coverage should not depend *solely* on the whim of the drafter of the claim, that is, on whether the claim contains the word, "encourage" instead of "demand," or "voluntary" instead of "mandatory." It is perhaps for this reason that many courts, in assessing whether there has been a "suit" triggering the duty to defend, look not only to the language of the claim but also to the context in which the claim is made. As Judge Coffrin of the District of Vermont counseled, courts should keep in mind "the unique aspects of CERCLA." *Morrisville*, 775 F.Supp. at 733. The court is persuaded, moreover, that the reasonable insured would consider not only the language of the claim at issue but also the realities of CERCLA and the probable financial consequences of the PRP designation.

The PRP designation and the invocation of administrative proceedings under CERCLA has significant and immediate consequences for the named party. As the insured in *Hazen* argued, the PRP's "rights and obligations could be substantially affected by actions and determinations occurring before any lawsuit would be commenced." *See Hazen*, 555 N.E.2d at 579. The Ninth Circuit put it this way:

> Unlike the garden variety demand letter, which only exposes one to a potential threat of future litigation, a PRP notice carries with it immediate and severe consequences. Generally, a party asserting a claim can do nothing between the occurrence of the tort and the filing of the complaint that can adversely affect the insureds' rights. However, in a CERCLA case, the PRP's substantive rights and ultimate liability are affected from the start of the administrative process.

*Aetna Cas. & Sur. Co. v. Pintlar Corp.*, 948 F.2d 1507, 1516 (9th Cir.1991) (citing district court opinion in *Avondale Indus., Inc. v. Travelers Indem. Co.*, 697 F.Supp. 1314, 1321 (S.D.N.Y.1988), *aff'd*, 887 F.2d 1200 (2d Cir. 1989)). *See also Quaker State Minit–Lube, Inc. v. Fireman's Fund Ins. Co.*, 868 F.Supp. 1278, 1308 (D.Utah 1994), *aff'd* 52 F.3d 1522 (10th Cir.1995).

The creation and development of the administrative record is of crucial importance in CERCLA's regime. The current trend of EPA practice is to use administrative notices instead of formal lawsuits to achieve the goal of remediating environmental contamination. *See Hazen*, 555 N.E.2d at 581. Furthermore, the PRP letter is EDO's earliest opportunity to participate in the creation of the administrative record. In addition, the PRP letter EDO received invited EDO to comment on the feasibility study, and indicated that it would consider public comment in selecting a course of action for remediating the site—a course of action for which EDO was likely to incur financial liability. The *Morrisville* court observed:

> [A]ny court action by the EPA under CERCLA is limited to the administrative record, and a court can consider only whether the EPA's "decision was arbitrary and capricious or otherwise not in accordance with law." ... Therefore, Morrisville's participation in the development of the administrative record was also crucial to protecting its interests. If it had not agreed to actively respond to the EPA's letter, [it] could have lost the opportunity to protect its interests well before the EPA brought a lawsuit against it. In other words, Morrisville had no practical choice other than to voluntarily comply with the EPA's demands.

*Morrisville*, 775 F.Supp. at 733 (citation omitted). *Accord, Ryan*, 916 F.2d at 741 (stating that the likelihood that PRP will incur liability does not often hinge upon the filing of a formal complaint in court).

Considering both the language of the PRP letter and the context in which it was sent, the court finds that the effect of its receipt on EDO was "so substantially equivalent to the commencement of a lawsuit that a duty to defend arose immediately." *See Hazen*, 555 N.E.2d at 581; *Ryan*, 916 F.2d at 741 ("If the government assumes an adversarial posture, making sufficiently clear that the force of the State will be brought to bear in a way that threatens the insured with probable and imminent financial consequences, then the functional equivalent of a suit may be in progress and the insured might reasonably

expect the insurer to defend."). In the court's view, EDO would reasonably consider the PRP letter to be a notification that it was the subject of "serious pursuit by an agency" and would expect Newark and Aetna to provide a defense within their policies' coverage. *See id.* at 742. Put differently, the ordinary business person, having received the PRP letter, would understand that the EPA was attempting to gain an end through the use of legal process.

Accordingly, the court holds that the Connecticut Supreme Court and New York Court of Appeals would consider the PRP letter to be a "suit" sufficient to trigger the duty to defend under the terms of the subject policies.

■ Because the court has found that the PRP letter constitutes a "suit," it need not rule on EDO's alternate contentions. It takes this opportunity to note, however, that it has "little trouble" viewing the Special Notice letter of May, 1990 as a "suit." *See Avondale,* 887 F.2d at 1206. The Special Notice letter contains "a formal demand for reimbursement of the costs, including interest thereon, that have been incurred and that are expected to be incurred in response to the environmental problems at the Site." (Berringer Aff. Ex. O, at 1.) The Special Notice letter states that the cost of the response actions to date are approximately $2,291,134.11 with the interest on those costs being approximately $491,172.00. (*Id.* at 2.) It also states that the EPA has already "established an Administrative Record." (*Id.* at 5.)

Strikingly, the Special Notice letter employs the terms "encourage" and "voluntary." In particular, it states: (1) that the EPA "is seeking [EDO's] voluntary participation in performance or financing of the remaining response actions necessary at the site" (*id.* at 1); (2) that "[b]y this letter, EPA encourages you, as a potentially responsible party, to reimburse EPA for the costs incurred to date and to voluntarily perform or finance the response activities described below that EPA

has determined are required at the Site" (*id.* at 2); and (3) that EDO is "encouraged to voluntarily negotiate a settlement." (*Id.* at 3.) The words "voluntary" and "encourage" in the context of the Special Notice letter, as in the PRP letter, do not negate the conclusion that the EPA has adopted an adversarial posture with respect to EDO.

### B. The Allegations of the Underlying Claim Do Not Exclude the Possibility of Coverage

■ The court must now determine whether the allegations of the claim contained in the PRP letter fall within the coverage afforded by the policies.

In both New York and Connecticut, the duty to defend rests solely on whether the allegations of the claim in the underlying action potentially bring the claim within the scope of the coverage purchased. *See New York v. AMRO Realty Corp.,* 936 F.2d 1420, 1427 (2d Cir.1991) (New York law); *City of West Haven v. Liberty Mut. Ins. Co.,* 639 F.Supp. 1012, 1017 (D.Conn.1986) (Connecticut law). "An insurer may not refuse the tendered defense of an action unless a comparison of the policy with the underlying complaint shows on its face that there is no potential for coverage. . . . In making the comparison any ambiguous or equivocal expressions in the policy will be strictly construed against the insurer." *Clinton v. Aetna Life & Sur. Co.,* 41 Conn.Supp. 560, 563, 594 A.2d 1046 (1991) (citation omitted).

■ "To avoid the duty [to defend,] therefore[,] the insurer must demonstrate that the allegations in the underlying complaints are 'solely and entirely' within specific and unambiguous exclusions from the policy's coverage." *Avondale,* 887 F.2d at 1204–05 (citation omitted). Moreover, in assessing whether the allegations of the underlying claim potentially fall within coverage, the insurer is precluded from looking beyond the four corners of the underlying complaint—or, in this case, the PRP letter.[8] This rule applies even

---

8. Aetna and Newark propound a novel argument. They concede that the duty to defend is triggered by the allegations contained in the "four corners" of the complaint initiating the

lawsuit, but argue that "the rule expressly includes documents incorporated by reference into the complaint." (Newark's & Aetna's Mem. Supp.Summ.J. at 4–5.) Consequently, they ar-

if the claims appear meritless or to lack a factual basis. *AMRO*, 936 F.2d at 1426; *Firestine v. Poverman*, 388 F.Supp. 948, 950 (D.Conn.1975) ("It is irrelevant to the existence of a duty to defend whether or not the complaint is groundless and whether or not the insurer will eventually be able to establish that it has no duty to indemnify the insured.").

Applying these principles, the court finds that the allegations of the claim contained in the PRP letter allow for the potential for coverage. The PRP letter states that "[t]he EPA has determined that a release of hazardous substances ... has occurred at the [Site]." (Berringer Aff.Ex.L.) It also alleges that "trichoroethylene [sic] (TCE), as well as other chemicals, is contaminating the groundwater aquifer underneath the [Site]." (*Id.*) Because the Letter is couched in general terms, and is silent as to the nature of the polluting releases, whether abrupt or slow, short term or long term, expected or unexpected, intentional or unintentional, it allows for the possibility that the pollution referred to occurred both suddenly and accidentally—and therefore that it was covered by the policies.

A comparison with the complaint at issue in *Blank* is instructive. The EPA's letter to EDO, like the complaint in *Blank*, "does not describe precisely how the discharge of [the pollutant] occurred." *Blank*, 27 F.3d at 790. Rather, "the complaint is couched in the general terms appropriate for a complaint brought pursuant to CERCLA's strict liability provisions." *Id.* As the Second Circuit

stated in *Blank*, "[i]n interpreting the allegations of the complaint, we construe ambiguous or poorly worded terms in favor of the insured. In particular, where the allegations of the underlying complaint are general, ambiguous, or inaptly phrased, courts construe the allegations in favor of coverage." *Id.*

The court finds that the "broad, general allegations" of the PRP letter in this case, "admit of the possibility that property damage was caused, if even in part, by the 'sudden and accidental' discharge of [TCE]." *Id.* at 791; *see also Avondale*, 887 F.2d at 1205–06 (affirming that insurers had duty to defend where "[n]one of the[ ] conclusory assertions [in the underlying complaint] 'clearly negate' the possibility that discharge or escape was 'sudden and accidental.'") The court cannot find, therefore, that Aetna and Newark have met their burden of establishing that "all of the allegations of the complaint fall entirely within the exclusion, and are subject to no other interpretation." *Blank*, 27 F.3d at 790. Accordingly, the court holds that the policies' pollution exclusion clauses with the exception for "sudden and accidental" releases do not relieve Aetna and Newark of their respective obligations to defend EDO.

As to Aetna's 1986 policy containing the absolute pollution exclusion, however, Aetna is entitled to summary judgment that it did not breach its duty to defend. The allegations of the PRP letter, which clearly identify TCE releases, *i.e.* pollution, as the cause of the contamination, fall entirely within the

gue, the court cannot simply consider whether the allegations of the PRP letter triggered the duty to defend, but must consider whether the "allegations" of the Remedial Investigation and Feasibility Study referenced in the PRP letter would trigger the duty to defend. These studies, they contend, indicate that the pollution did not occur suddenly and accidentally and thus relieve them of their defense obligation.

The three cases Aetna and Newark cite do not support the proposition that, when considering whether the duty to defend has been triggered, a court must look not only to the allegations of the complaint, but also to the allegations of all documents referenced therein. The court finds no reason, therefore, to abandon the well-settled principle that, for the purposes of assessing whether a claim has triggered the duty to defend,

the court is precluded from looking beyond the four corners of complaint or other document that constitutes the claim. *See, e.g., AMRO*, 936 F.2d at 1426 ("It is well established that a liability insurer has a duty to defend its insured ... if the pleadings allege a covered occurrence, even though facts outside the four corners of those pleadings indicate that the claim may be meritless or not covered."); *Paxar Corp. v. Lumbermens Mut. Cas. Co.*, No. 90 Civ. 8059, 1993 WL 126705, at *2, 1993 U.S. Dist LEXIS 5102, at *6 (S.D.N.Y. Apr. 19, 1993) ("It is well settled that courts cannot look beyond the four corners of an underlying complaint when making a determination as to the applicability of the pollution exclusion clause, notwithstanding the existence of extrinsic facts indicating the exclusion's applicability.").

1986 policy's absolute pollution exclusion as the court has previously construed it.

## II. The Insurers' Duty to Indemnify

As noted above, all of the insurance policies at issue contain duties to indemnify. The insurers argue that, because the court ruled previously that the pollution at issue falls within the policies' pollution exclusion clauses, they are relieved of their respective indemnification duties. The court agrees.

"The duty to defend has a broader aspect than the duty to indemnify and does not depend on whether the injured party will prevail against the insured." *Missionaries of the Co. of Mary, Inc. v. Aetna Cas. & Sur. Co.*, 155 Conn. 104, 110, 230 A.2d 21 (1967) (citation omitted). By contrast, the duty to indemnify depends upon "whether the coverage in question in fact exists." *Saint Paul Fire & Marine Ins. Co.*, 22 Conn.App. at 382, 577 A.2d 1093 (citations omitted).

The court's February 15, 1995 ruling found that the pollution at issue was not "sudden." *EDO*, 878 F.Supp. at 375–76. That finding establishes that there was no coverage under the policies, and absolves the insurers of their duty to indemnify.[9]

## CONCLUSION

Based on the foregoing, Aetna's and Newark's motions for summary judgment are each GRANTED IN PART AND DENIED IN PART. Newark's motion for summary judgment [doc. # 202] is GRANTED as to the duty to indemnify but DENIED as to the duty to defend. Aetna's motion for summary judgment [doc. # 204] is GRANTED as to the duty to indemnify, and DENIED as to the duty to defend with respect to all but the 1986 policy containing the absolute pollution exclusion clause, with respect to which Aetna's motion is GRANTED. American's and

Burnhope's respective motions for summary judgment [docs. ## 225, 226] are GRANTED.

Because additional issues in the case remain as to Aetna and Newark, *see supra* note 1, the case shall remain open as to them. As to American and Burnhope, however, this case is now closed.

SO ORDERED.

---

**9.** The court wishes to make clear that it does *not* decide, at this time, whether Aetna's and Newark's breach of the duty to defend EDO will result in their being required to indemnify EDO. That determination must await a ruling on the choice of law question. *Compare Keithan v. Massachusetts Bonding & Ins. Co.*, 159 Conn. 128, 139, 267 A.2d 660 (1970) (stating that Connecticut law requires indemnification up to the policy limits if insurer breaches the duty to defend,

without regard to whether there existed a duty to indemnify) *with Servidone Constr. Corp. v. Security Ins. Co. of Hartford*, 64 N.Y.2d 419, 488 N.Y.S.2d 139, 142, 477 N.E.2d 441, 444 (1985) (stating that, under New York law, indemnification is not the penalty for the breach of the duty to defend; an insurer who breaches the duty to defend is liable only for reasonable counsel fees and necessary expenses).